777 N.W.2d 793 (2010)
279 Neb. 199
STATE of Nebraska, appellee,
v.
Patrick W. SCHROEDER, appellant.
No. S-07-972, S-07-973.
Supreme Court of Nebraska.
January 15, 2010.
*798 James R. Mowbray and Robert W. Kortus, of Nebraska Commission on Public Advocacy, Lincoln, for appellant.
Jon Bruning, Attorney General, and James D. Smith, Lincoln, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

NATURE OF CASE
Patrick W. Schroeder was convicted of first degree felony murder, use of a deadly weapon to commit a felony, and forgery in the second degree. The forgery was charged in a separate indictment, but was consolidated with the other charges for trial. The charges relate to the death and robbery of Kenneth F. Albers on April 14, 2006, and a forged check written on Albers' account and deposited into Schroeder's account 3 days before the murder. Schroeder argues that he could not receive a fair trial 40 miles away from where a first trial resulted in a hung jury, that his confessions and incriminating evidence found as a result of the confessions were inadmissible, that the joinder of the forgery and first degree murder charges impermissibly presented the jury with evidence of premeditation when he was not charged with premeditated murder, and that the jury should have been instructed on lesser-included offenses. For the reasons set forth below, we affirm.

BACKGROUND
Albers lived alone on a farmstead just outside of Pawnee City, Nebraska. At approximately 6:45 a.m. on Friday, April 14, 2006, a farmhand arrived at Albers' house to report for work. Albers could not be found. There was blood in the house, primarily located between Albers' bedroom and a hall closet. Law enforcement was contacted and later discovered an empty lockbox inside the hall closet. The key to the lockbox was still in the lock, and the key and the edge of the lockbox were covered in Albers' blood. More blood was found on the ground inside a machine shed near the house. Albers' body was eventually discovered at the bottom of a well located on the farmstead. A pathologist testified that the cause of death was multiple blows to the head by a blunt instrument.

SCHROEDER'S ARREST AND CONFESSION
Schroeder had worked for Albers from May 2002 until Schroeder was fired in August 2002. On April 11, 2006, a check written on Albers' account, made out to Schroeder for the sum of $1,357, had been deposited into Schroeder's bank account. On April 13, the day before Albers' death, Albers had signed an affidavit reporting that he had neither signed nor authorized the check.
A witness said that at approximately 6:20 a.m. on April 14, 2006, she saw a red pickup parked alongside the highway near Albers' farmstead. At approximately 7:20 a.m., Schroeder pulled his wife's red pickup into the gas station across the street from his house and gave the owner $1,000 in cash to pay an outstanding balance *799 on his account. The station owner testified that while Schroeder had always made payments in cash, he had never received a payment from Schroeder over $50. It had been a significant period of time since Schroeder had made any payments at all.
Schroeder was arrested on the evening of April 14, 2006, on a charge of forgery. At the time of his arrest, Schroeder was carrying $1,700 in cash. Schroeder was first interviewed by Investigator Joel Bergman on April 15 at 9 p.m. in the Otoe County jail. Bergman informed Schroeder of his Miranda rights, and Schroeder waived those rights. Bergman initially told Schroeder that he was being questioned about the forgery, but Schroeder brought up Albers' murder, which he claimed he had heard about while watching the news. He asked Bergman about the truth of news reports that he was a person of interest in the investigation of Albers' murder. Bergman confirmed that those reports were true.
Bergman asked Schroeder for ideas as to who might be responsible for the crime. He also asked Schroeder to clarify some facts, especially the amount of cash that Schroeder had spent recently. Schroeder asserted that he had sold some calves to Albers and that the check was legitimate. Schroeder seemed surprised when Bergman informed him that Albers had reported the check as a forgery. Schroeder claimed the cash he had been spending came from his family's savings. Schroeder appeared confident and ridiculed Bergman for attempting to seek an explanation for every penny Schroeder had recently spent.
Schroeder suggested to Bergman other possible suspects for Albers' murder. He claimed he was possibly being framed. Apparently eager to prove his innocence, Schroeder volunteered to take a polygraph examination. Bergman responded: "I appreciate the offer for the polygraph ... it's something we're trying to get set up ... to... let you have that opportunity ... to prove that you didn't have anything to do with it." Otoe County does not have a polygraph machine.
When Bergman returned to the theme of Schroeder's expenditures, gently implying that it was suspicious that Schroeder had had $3,000 "floating around" in the past 2 days, all in "hundies," Schroeder became angry and indignant. Schroeder replied, "So what? So? That's the end of this conversation. I'm done." Bergman later testified that he understood this statement to mean Schroeder "was done talking to [him] for the time being" and that he intended to honor Schroeder's request.
Bergman said "okay." But he added a "wrap up type statement": "Well, [Albers] was killed for his money. We know that." Bergman later testified that he wanted to explain "why [he had been] asking the questions [he] was asking." Schroeder responded to Bergman's wrap-up statement by saying, "For what? A fucking check? Is that what you're saying or what?" Bergman stated that no, he meant the cash at Albers' home.
Schroeder shook his head, said something inaudible, and the tone of the conversation again relaxed. The interview appeared to be over. Schroeder and Bergman prepared to leave the interview room. As they did so, Bergman asked Schroeder whether he was still willing to take the polygraph. Schroeder said "yeah," and Bergman said they would get it set up. Bergman asked if Schroeder had any further questions, to which Schroeder responded that he wanted to know when he would be going to court on the forgery charge, and the two left.
*800 Schroeder's first polygraph examination was on April 17, 2006, in Lincoln. Before administering the test, the examiner, Investigator David Heidbrink, went over Schroeder's Miranda rights with him. Schroeder signed both a rights advisory form and a waiver and release form. Heidbrink explained that it was important that the test be taken of Schroeder's own free will. Schroeder affirmed that it would be. Heidbrink informed Schroeder he could stop the questioning at any time. He further explained that Schroeder had a right to counsel, and when Schroeder specifically asked if he needed an attorney, Heidbrink told him that was "entirely up to [Schroeder]."
When Schroeder admitted that he had only slept 3 hours the night before, Heidbrink expressed concern that this might affect the examination, but they proceeded. During the examination, Schroeder denied any involvement in the murder, but he admitted to the forgery. The tests were ultimately inconclusive as to whether he was being truthful. Heidbrink informed Schroeder that because the results were inconclusive, he could retake the examination if he wanted to. Schroeder questioned Heidbrink about whether the examination was truly inconclusive or whether they were just trying to get him to admit to more. When he was satisfied with Heidbrink's explanation, Schroeder agreed to retake the examination the following day.
Before the second polygraph examination, Heidbrink again reviewed Schroeder's Miranda rights with him. Schroeder again signed a waiver of his Miranda rights and also a polygraph examination release form. During the examination, Schroeder repeated the limited admission he had made the day before.
After the test, Bergman joined Heidbrink to inform Schroeder that the results showed he was being deceptive. In this post-polygraph interview, Heidbrink explained: "[F]or some reason either you're holding back on us and not being completely truthful or maybe it's a possibility you didn't actually do this, but you were there." Heidbrink explained further: "I mean, I don't know, it's something we're gonna have to talk about." Bergman expressed sympathy for Schroeder's financial situation and also his belief that Schroeder knew something about what had happened on April 14, 2006. Without further prompting, Schroeder agreed to tell the investigators "everything" on the condition that they first give him a chance to meet with his wife. They agreed.
As Bergman and Heidbrink tried to get in touch with Schroeder's wife to arrange the meeting, they engaged in smalltalk with Schroeder and discussed picking up food on the way to meet his wife. Unsolicited, Schroeder asked the investigators what kind of charges he might be facing. When they informed Schroeder that they did not know until they knew more about what happened, Schroeder admitted that the murder "wasn't self defense." During this time, Schroeder also revealed where the rest of the money was hidden in his wife's pickup and commented, "I probably said more than I probably should have without a lawyer, but oh well, I did what I did, now I'll pay for it."
Schroeder was taken to the Pawnee County sheriff's office to meet with his wife. After the meeting with his wife, Schroeder gave the investigators a detailed confession to the crimes. Schroeder explained that "[i]n a certain sense," the forged check and the subsequent murder were connected to each other. Schroeder explained he was "tired of pinching pennies." He had brought a change of clothing on the day of the murder and robbery, because he knew that if he and Albers met *801 face to face, "there was going to be problems." Schroeder did not wear a mask. Schroeder described in detail how he had rung the doorbell at Albers' home and how, when Albers came to the door, Schroeder hit him in the head with a nightstick and demanded that Albers open the lockbox. Albers went to his bedroom to retrieve his keys from a pants pocket, opened the lockbox, and handed Schroeder the money. Schroeder then directed Albers to walk out to the machine shed, where Schroeder killed him.
Schroeder first stated that he led Albers to the machine shed because he wanted to get Albers away from any telephone. He started to repeatedly hit Albers in the head when Albers turned toward him, and he did not "know if [Albers] was coming at [him] or what." Schroeder said he knew at that moment he was going to have to kill Albers.
But later during the same interview, Schroeder admitted he went to Albers' home that Friday with the intention of killing him. He explained he had formed this intent on the prior Tuesday or Wednesday, when he realized that Albers would discover the forged check and might file charges against him. He did not know at the time of the murder that Albers had already disavowed the check.
During his confessions, Schroeder told investigators where they could find Albers' stolen checkbook. He also told them where to find the bloodstained nightstick, $100 bills, an envelope of money, and clothing that Schroeder was wearing during the murder. Investigators found all of the items. The bloodstains matched Albers' DNA.

VENUE AND VOIR DIRE
Schroeder was originally tried in the district court for Pawnee County. But on March 28, 2007, the jury deadlocked and the court declared a mistrial. Both the prosecution and the defense requested a change of venue for the retrial. The district court agreed that a fair and impartial trial could no longer be had in Pawnee County. The court ordered the venue moved to the district court for Richardson County, located in Falls City, Nebraska, approximately 40 miles by road from Pawnee City.
The defense did not object to the new venue until the day of voir dire, when counsel argued that the move was not sufficiently far away. The court overruled the objection. The court also denied defense counsel's motions for supplemental jury questionnaires and individual voir dire. The court did agree to consider individual voir dire as needed. Ultimately, four jurors were questioned individually. As a result, the court dismissed two of those jurors for cause. The other two questioned were eliminated through the use of Schroeder's peremptory challenges. None of the jurors that Schroeder specifically challenged for cause served on the jury, although he made a general objection to the venire.

TRIAL
The court denied defense counsel's motion to suppress Schroeder's confessions. It also denied his motion to suppress all evidence seized from Schroeder's person, possession, and residence found as a result of the confessions. The district court determined that Schroeder had exercised his right to terminate the first interrogation. It suppressed any comments made by Schroeder during the first interrogation after he invoked his right to cut off questioning. Nevertheless, the court found that the admission of subsequent interviews did not violate Schroeder's Fifth Amendment rights.
The court also denied Schroeder's request to sever the forgery charge and the *802 felony murder and use of a deadly weapon charges. The defense argued that by joining the forgery and felony murder charges, the State was able to present prejudicial evidence of premeditation even though it had chosen not to charge Schroeder with premeditated murder. The court concluded that the forgery and the robbery were two acts "connected together or constituting parts of a common scheme or plan by [Schroeder] against [Albers]." The court further found that Schroeder had failed to sustain his burden to prove he would be prejudiced by the consolidation, because the evidence relating to the forgery would have been admissible in a separate trial for felony murder.
The court denied Schroeder's alternative motion to instruct the jury on the lesser-included offenses of premeditated murder. It also denied Schroeder's request that it instruct on unlawful-act manslaughter as a lesser-included offense of felony murder. The court did instruct the jury, "Any evidence you have received in regards to forgery must be considered by you only in respect to the forgery count and no other count before you." The court further instructed that the jury could only use Schroeder's statements to police if it first found, beyond a reasonable doubt, that those statements were made freely and voluntarily. Despite Schroeder's argument that he had been set up and that the confessions were coerced, the jury found Schroeder guilty on all counts.

ASSIGNMENTS OF ERROR
Schroeder asserts that the trial court (1) erroneously failed to suppress evidence that was the product of interrogations conducted after Schroeder had invoked his right to cut off questioning, (2) erroneously consolidated the felony murder and forgery charges into a single trial, (3) failed to properly instruct the jury on lesser-included offenses, and (4) erroneously failed to change venue.

STANDARD OF REVIEW
A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse of discretion.[1]
A motion for a separate trial is addressed to the sound discretion of the trial court, and its ruling on such motion will not be disturbed in the absence of a showing of an abuse of discretion.[2]
An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[3]
In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in Miranda v. Arizona,[4] we apply a two-part standard of review. With regard to historical facts, we review the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which we review independently of the trial court's determination.[5]

*803 ANALYSIS

VENUE
We first address Schroeder's argument that the trial court erred in failing to grant a change of venue from Richardson County. Schroeder does not challenge any particular juror that sat for his trial, as no juror that Schroeder individually challenged actually sat on the jury. Instead, Schroeder argues that pretrial publicity made all the jurors inherently unreliable in their attestations of impartiality. He also argues that the trial court did not handle the voir dire with the thoroughness warranted by the publicity.
In Irvin v. Dowd,[6] the U.S. Supreme Court held that the overwhelming negative publicity against the defendant should have mandated a change of venue not just to a county adjoining the county in which the murders had occurred, but to a county geographically far enough removed to be untainted by the publicity. We have said that the court is not limited in granting a change of venue to an adjoining county when the showing of prejudice is equally or sufficiently strong as to the adjoining county.[7] But a court will not presume unconstitutional partiality because of media coverage unless the record shows a barrage of inflammatory publicity immediately prior to trial, amounting to a huge wave of public passion or resulting in a trial atmosphere utterly corrupted by press coverage.[8] We agree with the trial court that the evidence provided by Schroeder did not demonstrate the type of "invidious or inflammatory"[9] coverage that could create such a presumption of prejudice  much less the pervasiveness.[10]
In support of the motion for change of venue, Schroeder offered three articles from the Lincoln Journal Star, one article from the Omaha World-Herald, one duplicate article run in the Beatrice Daily Sun, and a printout of online commentary to the Lincoln Journal Star article. He did not provide any evidence of the extent to which these publications circulated in Pawnee County or Richardson County. Three of the articles described a posttrial confrontation between Albers' youngest son and the single juror who had remained unconvinced of Schroeder's guilt. The son had accused the holdout juror of simply wanting a moment of fame. The second article described the expense the county would incur as a result of two trials.
The articles outlined the trial evidence against Schroeder and also mentioned his previous convictions for theft and escape. The online commentary consisted of various members of the public either criticizing the holdout juror or reproaching others for making assumptions about a trial for which they were not present.
While these articles and the online commentary are not entirely favorable, they do not raise concerns of public passion against Schroeder within the meaning of Irvin v. Dowd.[11] Mostly, they reflect that Albers' family believed Schroeder was guilty  a fact that could have been guessed regardless. That a previous jury was unable to unanimously find Schroeder guilty is at least as favorable to him as prejudicial. And certainly, five articles *804 failed to demonstrate the publicity was so widespread to have corrupted the mind of all potential jurors  particularly when there was no evidence of the extent to which that publicity reached the community in question.
Under most circumstances, voir dire examination provides the best opportunity to determine whether a court should change venue.[12] The majority of the jurors questioned for Schroeder's trial did have some knowledge of the crime. In addition, the venire was made aware that there had been a mistrial. The majority of the jurors questioned, however, did not appear to have particularly extensive exposure to facts of the crime or the particular facts relating to the mistrial. More importantly, 37 of the 50 potential jurors stated that they had never expressed or held an opinion as to whether Schroeder was guilty of the crimes charged. Of the 13 who had formed some opinion of Schroeder's guilt, 5 affirmed quite readily that that opinion could be set aside. The trial court excused the remaining eight jurors when they expressed even the slightest doubt in their ability to set aside that opinion.
We disagree with Schroeder that the voir dire of these jurors was somehow inadequate. The jurors were questioned about whether they had formed any opinion as to Schroeder's guilt and whether they had heard any reports about the crimes. If they had heard anything, the jurors were questioned as to the source of their information. After this group voir dire was complete, an off-the-record discussion was had between the attorneys and the court and the court called back in four of the potential jurors for individualized questioning. There is no evidence that the court refused to individually examine any specified juror over whom defense counsel had special concerns.
A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse of that discretion. Due process does not require that a defendant be granted a change of venue whenever there is a "`reasonable likelihood'" that prejudicial news prior to trial would prevent a fair trial.[13] Rather, a change of venue is mandated when a fair and impartial trial "cannot" be had in the county where the offense was committed.[14] We find no abuse of discretion in the trial court's conclusion that a fair and impartial trial could be had in Richardson County.

JOINDER
We next address Schroeder's assertion that the charges of forgery and felony murder should not have been tried together. The joinder or separation of the charges for trial is governed by the principles of Neb.Rev.Stat. § 29-2002 (Reissue 2008).[15] There is no constitutional right to a separate trial.[16]
Section 29-2002 states in relevant part:
(1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count *805 for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
....
(3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint or by such joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.
Whether offenses are properly joined involves a two-stage analysis in which it is determined first whether the offenses are related and properly joinable and second whether an otherwise proper joinder was prejudicial to the defendant.[17]
The forgery and the felony murder offenses were properly joinable because they were "connected together" and "constituted] parts of a common scheme or plan."[18] In this case, as the trial court noted, there was a continuing scheme by Schroeder to deprive Albers of the liquid assets that Schroeder knew Albers possessed. Not only that, but one crime led to the other. They are logically connected. Schroeder estimated the amount of time it would take for the forged check to clear, and he decided to finish the job before that happened. Schroeder decided to enter Albers' home, steal the cash he kept there, and then hide both crimes by killing Albers.
Schroeder argues that the forgery was unduly prejudicial to the murder charge because it demonstrates premeditation. According to Schroeder, the "key" to his argument is the fact that the State elected to prosecute the murder charge under the sole theory of felony murder and not also under a theory of premeditated murder.[19] In effect, Schroeder argues the State forfeited its right to present evidence of premeditation.
We note, first, that the jury was instructed not to consider the evidence of the forgery as evidence of any other charge. Second, the evidence of premeditation was not inexorably tied to the forgery charge. Schroeder's confession that he went to Albers' house intending to kill him would not simply have disappeared had the forgery not been tried in a consolidated trial.
In any event, a defendant is not considered prejudiced by a joinder where the evidence relating to both offenses would be admissible in a trial of either offense separately.[20] If the felony murder charge had been tried separately, the admissibility of the forgery to prove the subsequent felony murder would have been governed by Neb.Rev.Stat. § 27-404(2) (Reissue 2008). Section 27-404(2) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. *806 It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
This statutory list of permissible purposes for admission of evidence of other crimes, wrongs, and bad acts is not exhaustive, and the purposes set forth in the statute are illustrative only.[21]
The evidence relating to the stolen, forged check would not have been admissible to show Schroeder's propensity for thievery or crime. The prior forgery does, however, properly illustrate Schroeder's motive, intent, plan, knowledge, and identity and an absence of mistake or accident for the crime of felony murder. The evidence relating to the forgery illustrated that Schroeder was feeling under pressure to come up with money to pay his bills and that he had chosen to target Albers. Furthermore, he did not want to get caught after cashing Albers' check. It was not coincidental that Albers was robbed and killed only 3 days after the forged check was deposited into Schroeder's account. Schroeder admitted that he went to Albers' house with the intent to kill Albers to cover up the forgery. In short, evidence of the forgery would have been admissible for a proper purpose in a felony murder trial, regardless of joinder.
Schroeder is correct in arguing that the connection between the two crimes also supports the inference that Schroeder premeditated Albers' murder. And premeditation of the killing is not an element of felony murder.[22] Nevertheless, it does not follow that all evidence suggesting premeditation is improper and irrelevant in a case tried solely on the theory of felony murder. The forgery illustrates Schroeder's motive to commit felony murder. We have said that while proof of motive is not an element of first degree murder, any motive for the crime charged is relevant to intent.[23] And intent, while not an element of felony murder, is still relevant to illustrate the circumstances of the crime. Moreover, the identity of the defendant as the perpetrator of the crime is always relevant in a case such as this, where the defendant claims no involvement in the crime. When, as in this case, motive is particular to the defendant and is not shared with the general public, it is also circumstantial proof that the defendant, and not someone else, is the perpetrator.[24] For example, in State v. Ruyle,[25] where the defendant was charged with felony murder by arson of the victim's apartment building, we held that not only were the defendant's prior threats to "`torch'" the intended victim's apartment *807 admissible at trial, but so were his prior statements threatening to shoot the intended victim. We explained that those threats explained the defendant's motive and the facts surrounding the incident. The trial court in the present case did not abuse its discretion in concluding that joinder was proper.

LESSER-INCLUDED OFFENSES
Alternatively, Schroeder argues that because the State operated under a de facto theory of premeditated murder, the trial court was obliged to instruct the jury on the lesser-included offense of premeditated murder. Other than a citation to the general proposition that a trial judge must instruct the jury on all pertinent law of the case,[26] Schroeder does not reference any legal authority for this argument. On the other hand, a long line of cases hold that as a general matter, felony murder is not divisible into lesser degrees of homicide.[27] Our cases also hold that where a set of facts is sufficient to constitute the violation of one of several crimes, the prosecutor is free to choose under which crime he or she will seek a conviction.[28] We find no reason in this appeal to depart from precedent. The State chose to seek a conviction on the theory of felony murder. It chose to take the risk of submitting to the jury only one means of finding Schroeder guilty of first degree murder. While Schroeder may have been deprived of lesser-included offense instructions, he was granted the possibility of acquittal if the proof of the robbery was found inadequate, regardless of whether the jury believed that Schroeder had killed Albers. However unlikely this benefit might be under the particular facts of this case, we are unconvinced due process is violated when a trial court fails to instruct on lesser-included offenses of a crime not charged.
Schroeder also argues that the jury should have been instructed on unlawful-act manslaughter as a lesser-included offense of felony murder. Schroeder explains that larceny and theft are lesser-included offenses of robbery and that manslaughter is a lesser-included offense of murder. And theft is not one of the possible predicate felonies for felony murder.[29] While this argument is novel, even assuming unlawful-act manslaughter is technically a lesser-included offense of felony murder, no such instruction was warranted by the facts of this case. Schroeder has failed to show how the evidence would support an acquittal of felony murder while supporting a conviction of unlawful-act manslaughter.
A court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense.[30] A person commits robbery if, with the intent to steal, he or she forcibly and by violence, or by putting in fear, takes from the person of another any *808 money or personal property.[31] The various crimes of theft, previously known as larceny, embezzlement, false pretense, and the like, do not contain this element of violence or fear.[32] They are otherwise similar insofar as the victim is deprived of his or her possessions.
The evidence is overwhelming that Albers was deprived of his possessions while subjected to violence and fear. Puddles of blood and his blood on the lockbox and its key demonstrate that Albers was injured as a means to force him to hand over his money. No evidence or argument was presented that the crime was otherwise. Such a crime was not a mere theft.[33] Because there was no rational basis for finding that Schroeder had committed theft but had not committed robbery, no instruction involving simple theft was warranted.

INVOCATION OF RIGHT TO REMAIN SILENT
Finally, we address Schroeder's argument that the trial court erred in failing to suppress his confessions and the physical evidence obtained as a result of those confessions. The motion was based on Schroeder's right to remain silent.
There is no dispute that Schroeder was interrogated while in police custody. Schroeder does not deny that prior to the first interview, he had initially waived his Miranda rights. Schroeder's argument is that law enforcement failed to scrupulously honor his clear invocation of his right to cut off questioning once the interview began. Because the facts surrounding the alleged invocation are recorded in the videotape and are not in dispute, this presents a question of law.[34]
The U.S. Supreme Court has explained that whether or not the suspect initially waived his or her right to remain silent, the suspect retains the right to cut off questioning.[35] The police are restricted to scrupulously honoring that right once it is invoked.[36] In contrast, when a defendant does not invoke his or her Miranda rights, an examination of whether those rights were scrupulously honored is not necessary.[37] We conclude that Schroeder did not clearly and unequivocally communicate that he wished all further questioning to cease.[38] Therefore, the authorities did not violate Schroeder's Miranda rights when they conducted subsequent interviews in connection with the polygraph examinations.
The suspect must articulate the desire to cut off questioning with sufficient clarity that a reasonable police officer under the circumstances would understand the statement as an invocation of the right to remain silent.[39] An officer should not have to guess when a suspect has changed his or her mind and wishes the questioning to end.[40] In other words, while the suspect does not have to "`speak with the *809 discrimination of an Oxford don,'"[41] ambiguous or equivocal statements that might be construed as invoking the right to silence do not require the police to discontinue their questioning.[42] In determining whether there has been a clear invocation, we review the totality of the circumstances surrounding the statement in order to assess the words in context.[43]
As we noted in Rogers, where the suspect's reference to silence is qualified by a temporal element like "`now'" or "`at this time,'" courts generally conclude that the statement is equivocal.[44] In this case, Schroeder told Bergman that it was "the end of this conversation." (Emphasis supplied.)
But Schroeder relies on the fact that in Rogers, we held that an unqualified "`I'm done,'" combined with "`I'm not talking no more,'" was a clear invocation of the right to remain silent.[45] We find Schroeder's statements are distinguishable. As already noted, Schroeder's statement was not unqualified. His statement, "I'm done," cannot be extricated from his statement immediately preceding it. The prior statement qualified that what he was "done" with was simply "this conversation." We have never held that any utterance of "I'm done," no matter what the surrounding circumstances or other statements, will be construed as cutting off all further questioning.
And it is of no small import that part of the context of the alleged invocation is Schroeder's prior request for a polygraph. We conclude that a reasonable police officer faced with a suspect's statement that "this conversation" is done, after the suspect had volunteered to take a polygraph examination as soon as one could be set up, would believe that the suspect wanted only to end the current conversation. To the extent that a reasonable police officer might believe that "this conversation" referred more broadly to all future discussion of the same topic, the statement is, at the most, ambiguous. We also note that for the most part, Bergman followed the "good police practice"[46] of asking clarifying questions. Bergman asked Schroeder whether he still wanted to take a polygraph examination. Schroeder indicated that he did.
In reality, by saying he was done with the conversation, Schroeder made a "limited" invocation of the right to remain silent: he exercised his right to control the duration of the interrogation. The U.S. Supreme Court has held that suspects have the right to control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation.[47] And in Connecticut v. Barrett,[48] the Court *810 held that a suspect had chosen to exercise a "limited" invocation of his Fifth Amendment right to counsel when he had agreed to waive that right as to any oral statement, but had demanded that an attorney be present for any written statement. The Court explained that "Miranda gives the defendant a right to choose between speech and silence, and [the defendant in Barrett] chose to speak."[49] The Court stated further that to interpret the suspect's statements as a broader invocation for all purposes would be a "disregard of the [statements'] ordinary meaning."[50]
Other courts have applied this reasoning to find a "limited" or "selective" invocation of the right to remain silent  applicable only to certain times or certain subjects.[51] But any statements made during the conversation after Schroeder wished to end it were suppressed by the trial court.
The continuing questioning of Schroeder during and after[52] his polygraph examinations was not in violation of Schroeder's right to remain silent. The trial court did not err in denying Schroeder's motion to suppress those statements.

CONCLUSION
The trial court did not err in denying Schroeder's motions to change venue, sever the charges, suppress, and instruct on lesser-included offenses. We affirm.
AFFIRMED.
NOTES
[1] State v. Galindo, 278 Neb. 599, 774 N.W.2d 190 (2009).
[2] State v. Montgomery, 182 Neb. 737, 157 N.W.2d 196 (1968).
[3] State v. Daly, 278 Neb. 903, 775 N.W.2d 47 (2009).
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] State v. Rogers, 277 Neb. 37, 760 N.W.2d 35 (2009).
[6] Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).
[7] See Gandy v. Estate of Bissell, 81 Neb. 102, 115 N.W. 571 (1908).
[8] Id.
[9] Murphy v. Florida, 421 U.S. 794, 801 n. 4, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).
[10] See State v. Galindo, supra note 1. Compare Irvin v. Dowd, supra note 6.
[11] See Irvin v. Dowd, supra note 6.
[12] See, State v. Galindo, supra note 1; State v. Rodriguez, 272 Neb. 930, 726 N.W.2d 157 (2007).
[13] State v. Bradley, 236 Neb. 371, 383, 461 N.W.2d 524, 535 (1990) (emphasis omitted). See Neb.Rev.Stat. § 29-1301 (Reissue 2008).
[14] § 29-1301. Accord State v. Bradley, supra note 13.
[15] See State v. Hilding, 278 Neb. 115, 769 N.W.2d 326 (2009).
[16] State v. Clark, 228 Neb. 599, 423 N.W.2d 471 (1988).
[17] See State v. Hilding, supra note 15.
[18] See § 29-2002(1).
[19] Brief for appellant at 28.
[20] See, State v. Garza, 256 Neb. 752, 592 N.W.2d 485 (1999); State v. Greer, 7 Neb.App. 770, 586 N.W.2d 654 (1998), affirmed in part and in part reversed on other grounds 257 Neb. 208, 596 N.W.2d 296 (1999).
[21] See State v. Egger, 8 Neb.App. 740, 601 N.W.2d 785 (1999).
[22] See, Hopkins v. Reeves, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998); State v. Banks, 278 Neb. 342, 771 N.W.2d 75 (2009); State v. Bjorklund, 258 Neb. 432, 604 N.W.2d 169 (2000); State v. Hubbard, 211 Neb. 531, 319 N.W.2d 116 (1982). See, also, e.g., Chance v. Garrison, 537 F.2d 1212 (4th Cir. 1976).
[23] See State v. McBride, 250 Neb. 636, 550 N.W.2d 659 (1996).
[24] See, e.g., State v. Nesbitt, 264 Neb. 612, 650 N.W.2d 766 (2002). See, also, e.g., Hernandez v. Cepeda, 860 F.2d 260 (7th Cir. 1988); United States v. Stumes, 549 F.2d 831 (8th Cir. 1977), abrogated on other grounds, Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); State v. Hubbard, 37 Wash.App. 137, 679 P.2d 391 (1984), reversed on other grounds 103 Wash.2d 570, 693 P.2d 718 (1985). Compare, People v. Holt, 37 Cal.3d 436, 690 P.2d 1207, 208 Cal. Rptr. 547 (1984); In re L.R., 84 S.W.3d 701 (Tex.App.2002).
[25] State v. Ruyle, 234 Neb. 760, 768, 452 N.W.2d 734, 739 (1990).
[26] See State v. Davlin, 263 Neb. 283, 639 N.W.2d 631 (2002).
[27] See, e.g., State v. Banks, supra note 22; State v. Bazer, 276 Neb. 7, 751 N.W.2d 619 (2008); State v. Bjorklund, supra note 22; State v. Moore, 256 Neb. 553, 591 N.W.2d 86 (1999).
[28] See, e.g., State v. Wright, 261 Neb. 277, 622 N.W.2d 676 (2001).
[29] Neb.Rev.Stat. § 28-303 (Reissue 2008).
[30] State v. Molina, 271 Neb. 488, 713 N.W.2d 412 (2006).
[31] Neb.Rev.Stat. § 28-324 (Reissue 2008).
[32] Neb.Rev.Stat. §§ 28-509 to 28-518 (Reissue 2008).
[33] See State v. Ruggles, 183 W.Va. 58, 394 S.E.2d 42 (1990).
[34] See State v. Rogers, supra note 5.
[35] See id. (citing cases).
[36] Id.
[37] State v. Adams, 127 N.J. 438, 605 A.2d 1097 (1992). See, also, State v. Rogers, supra note 5.
[38] See id.
[39] See id. See, also, Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).
[40] See id.
[41] Davis v. United States, supra note 39, 512 U.S. at 459, 114 S.Ct. 2350.
[42] See id.
[43] See, e.g., State v. Rogers, supra note 5; People v. Arroya, 988 P.2d 1124 (Colo. 1999).
[44] See State v. Rogers, supra note 5, 277 Neb. at 66, 760 N.W.2d at 59. See, also, e.g., State v. Ganpat, 732 N.W.2d 232 (Minn.2007); Com. v. Leahy, 445 Mass. 481, 838 N.E.2d 1220 (2005); State v. Sabetta, 680 A.2d 927 (R.I.1996); State v. Holcomb, 213 Or.App. 168, 159 P.3d 1271 (2007); State v. Bieker, 35 Kan.App.2d 427, 132 P.3d 478 (2006). See, also, U.S. v. Rodriguez, 518 F.3d 1072 (9th Cir.2008); State v. Markwardt, 306 Wis.2d 420, 742 N.W.2d 546 (Wis.App.2007).
[45] State v. Rogers, supra note 5, 277 Neb. at 70, 760 N.W.2d at 61-62.
[46] Davis v. United States, supra note 39, 512 U.S. at 461, 114 S.Ct. 2350.
[47] Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).
[48] Connecticut v. Barrett, 479 U.S. 523, 530, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987). See, also, State v. Holcomb, supra note 44; State v. Gascon, 119 Idaho 932, 812 P.2d 239 (1991); State v. Uraine, 157 Ariz. 21, 754 P.2d 350 (Ariz.App.1988).
[49] Connecticut v. Barrett, supra note 48, 479 U.S. at 529, 107 S.Ct. 828.
[50] Id., 479 U.S. at 530, 107 S.Ct. 828.
[51] See, e.g., Arnold v. Runnels, 421 F.3d 859 (9th Cir.2005); State v. Adams, supra note 37.
[52] See Wyrick v. Fields, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982).