IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. NASH


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

DENNIS NASH, JR., APPELLANT.


Filed July 2, 2019.    No. A-18-252.


Appeal from the District Court for Lincoln County: DONALD E. ROWLANDS, Judge. Affirmed.

P. Stephen Potter for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.


RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

After a trial in the Lincoln County District Court, a jury found Dennis Nash, Jr., guilty of third degree sexual assault of a child. Nash was sentenced to 3 years' imprisonment and 18 months' postrelease supervision. Nash appeals his conviction, claiming the district court erred by denying an oral motion for a plea in abatement, refusing to order a change in venue due to pretrial publicity, and permitting a witness to testify as an expert. Nash also contends that his sentence is excessive and his trial counsel was ineffective. We affirm.

## II. BACKGROUND

### 1. PRETRIAL PROCEEDINGS

In October 2016, the State filed a complaint in the county court for Lincoln County charging Nash with third degree sexual assault of a child, a Class IIIA felony, pursuant to Neb. Rev. Stat. § 28-320.01 (Reissue 2016). The State alleged that Nash, being a person 19 years of age or older, subjected a person 14 years of age or younger to sexual contact on August 2. After a preliminary hearing on November 10, the case was bound over to the district court, and an information was filed similarly charging Nash.

On December 13, 2016, Nash filed in the district court a plea in abatement to the information. Nash alleged there was "a defect in the record" in that the evidence presented at the preliminary hearing was insufficient as a matter of law to establish that the crime of third degree sexual assault of a child was committed and to establish probable cause that Nash committed the crime charged. After a hearing on January 9, 2017, the district court overruled Nash's plea in abatement in an order filed on January 20. Following several continuances, the district court set the matter for jury trial on January 9, 2018.

On January 3, 2018, the State filed a motion to qualify Anne Power as an expert witness regarding the generalities of child sexual abuse. At a hearing the next day, Nash's trial counsel objected to that motion. Power testified about her background; we will set forth those details when addressing Nash's assigned error related to this witness. The district court found that although Power did not have university training in psychology, her experience qualified her to testify as an expert witness "as to sexual abuse in generalities."

Also on January 4, 2018, Nash filed a motion in limine to prohibit the State from attempting to introduce in any manner (1) Nash's "video-taped statement" (he claimed the conversation contained irrelevant and immaterial discussions outside the facts of this case which would be highly prejudicial) and (2) evidence of Nash's prior criminal history beyond that statutorily allowed. At the hearing the same day, the district court took the motion in limine regarding the video under advisement (disposition not in record and video not offered at trial) and sustained the motion regarding Nash's criminal history. Nash then orally moved for a change of venue based on pretrial publicity. In overruling the motion, the district court said jury selection would be the best way to know if there was any extensive publicity that tainted the panel.

The jury was selected on January 9, 2018. Nash renewed his motion to change venue, and the district court again denied it. Nash made a separate oral motion asserting that: he was entitled to a jury of his peers, the jury panel did not include any minorities, and "there is nobody on that panel that may have a prospective [sic] as a minority." The district court noted several Hispanic or Latino individuals who were on the panel, and denied Nash's motion to "[q]uash" the jury as lacking anyone of African-American heritage. Nash orally moved to suppress DNA evidence, but the district court stated Nash did not have standing to assert that motion with reference to examination of "a pair of girl's underwear" and ultimately ruled that Nash was statutorily precluded from raising a later oral motion to suppress evidence at trial.

## 2. TRIAL

Trial began on January 10, 2018. A summary of the evidence relevant to this appeal follows.

### (a) State's Evidence

#### *(i) D.D.*

D.D. testified she was born in October 2001, and was 16 years old at the time of trial. She had known Nash since 2013, because Nash was dating her mother. D.D. "looked at [Nash] as [her] dad." In the summer of 2016, D.D. moved into a house with her mother, little sister, and Nash. Towards the end of July, Nash made D.D. "uncomfortable" when he "showed up" in her room late one evening and "asked if he could taste [her]"; D.D. thought this meant Nash was asking if he could "lick [her] vagina." D.D. told Nash "no." D.D. said Nash asked her not to tell anyone, she agreed not to tell, and he gave her $100 in exchange. D.D. "avoided" Nash after that.

Shortly thereafter, on August 1, 2016, D.D.'s mother was going to a friend's house that night. D.D. asked her mother to take her with her or for her mother to stay home because D.D. did not want to stay home with Nash. D.D. went with her mother to the friend's house and returned home around 1 a.m. D.D. had been home for about 30 minutes and was in her pajamas (black T-shirt, pink fuzzy pants, and purple and yellow underwear) when Nash came into her room "and acted like he was drinking a little bit." Nash asked D.D. if she wanted to have what he was having and then procured a drink for her. The drink was yellow and tasted like "Sunny D," but with a "stronger taste." She drank the entire glass. Nash wanted to watch a movie in D.D.'s room, to which she responded, "Whatever." Nash put a movie in and D.D. went to sleep. The next thing D.D. remembered was waking up and Nash's head was "moving" between her legs and his tongue was touching her vagina. She did not have on her pants or underwear. D.D. felt "[c]onfused and dizzy" and she "passed out." The next thing she remembered was waking up on the floor with her blanket wrapped around her. Nash was "messing with something on the bed" and told D.D. she needed to put her "'pants back on.'" D.D. was confused and told Nash to leave her room. D.D. got into her bed and "passed out" again. When she woke up, D.D. noticed she did not have any pants or underwear on. She "was confused, and everything started . . . coming back to [her]," and she realized what Nash had done to her. She could not find her underwear, but Nash's underwear was on her floor; she put his underwear in his closet because she "didn't want them in [her] room." D.D. did not tell her mother about the incident right away because she "wanted to be moved out of the house" when she told her mother; D.D., her mother, and her sister were planning on moving out of the home in early August 2016.

D.D. stated that Nash came into her room in the morning and "started talking about [her] permit because [she] was supposed to be turning fifteen." D.D. ignored Nash and he realized she was upset and he "dropped on his knees and told [her] not to tell anyone and told [her] that if [she] was going to tell someone to tell him now because he would just go out and kill himself"; D.D. agreed not to tell anyone. Nash went through D.D.'s computer to make sure she had not told her mother. He noticed that the day before, D.D. had asked her mother for a cat and he said he would buy D.D. a cat; D.D. said "okay." Nash told D.D. that he would go out and get her a cat, but that

she had to take a shower first; she went ahead and took a shower and then they went to the shelter and got the cat. "Right after" they got the cat, D.D. went to her friend's house and told her friend what had happened to her, and asked her friend not to tell anyone. D.D. stayed at her friend's house until D.D.'s mother got off work. After her mother got home from work and found out about the cat, she agreed that D.D. could keep the cat, but that it would stay at Nash's house while they moved. Nash offered to have a room for D.D. at his house so D.D. could see her sister and the cat.

D.D. testified that on August 4, 2016, the day they were moving out of the home they shared with Nash, she was at her friend's house and texted her mother and told her about Nash's assault and "about everything that happened." Her mother immediately picked her up and they went to the police station and talked with a police officer before going to the Bridge of Hope Child Advocacy Center (Bridge of Hope). At Bridge of Hope they took pictures of D.D., did vaginal swabs, and collected samples of her blood and hair. The sexual assault nurse examiner (SANE) who performed the exam of D.D. at Bridge of Hope testified about the exam. Law enforcement officers gave chain-of-custody testimony regarding the SANE evidence kit. Other law enforcement officers and personnel testified about the sexual assault investigation, including evidence collection; chain-of-custody testimony was also provided by the law enforcement officers and personnel, as well as personnel from the Nebraska State Patrol Crime Lab.

*(ii) D.D.'s Mother*

D.D.'s mother was asked about the night of August 1, 2016, and the early morning hours of the next day. She acknowledged she went to a friend's house with D.D. and watched a movie. When she and D.D. returned home, D.D.'s mother told Nash she was going to bed; she could tell Nash had been drinking. D.D. went to her room. In the morning, D.D.'s mother saw a text message from D.D. that said "[c]an you help" (D.D.'s mother identified an exhibit as a photograph of that text message which "came in at 4:07 a.m."). D.D.'s mother "got up right away" and saw Nash "sitting on the couch [asleep] with his penis in his hand" and his pants were "[d]own to his knees." She woke Nash and told him to "pull [his] hands [sic] up[,] [t]here's kids around." She went to D.D.'s room, and D.D. was sleeping. D.D.'s mother went to work. Later that day she found out D.D. got a cat. Nash offered to keep the cat at his house when D.D. moved out, and he and D.D.'s mother discussed keeping a room for D.D. at his house so they could "co-parent." Around August 4, D.D.'s mother received a text message from D.D., in which D.D. told her of the assault. Once her mother saw that text message, she picked D.D. up from D.D.'s friend's house and took her straight to the police station, and later to Bridge of Hope.

*(iii) Anne Power*

Power explained that Bridge of Hope is an agency that coordinates child abuse investigations, including those involving sexual assaults. Bridge of Hope does forensic interviews, has a medical program, and does advocacy and mental health coordination. During her 5 years at Bridge of Hope, an average of 315 forensic interviews per year were performed; Power personally conducted a total of 208 forensic interviews. Power received, on average, at least 200 hours of education each year on the dynamics surrounding abuse and child sexual assault. Power testified that not all cases referred to Bridge of Hope result in disclosures, or statements a child makes to

indicate child abuse has occurred. According to Power, the majority of child sexual assaults, 75 percent, are committed by a known perpetrator. A known perpetrator is "usually someone that the child recognizes, has a bond with, [and] feels safe with"; they have some kind of relationship with the child. An unknown perpetrator "would be a stranger," and "usually indicates an abduction of some type." When asked if she had seen any unknown offender cases at the Bridge of Hope, Power said: "I caution my response on this because a lot of little kids, three or four will say they don't know who it is. So I would say 1 to 2 percent would be the unknown," "[b]ut it may have been a known perpetrator as well."

When asked to explain the difference in a child's perception of violence in "known versus unknown perpetrator" cases, Power said, "Oftentimes . . . the child trusts the known offender and there's a relationship that's been established there." And since a known perpetrator wants continued access to a child, the key for the known perpetrator is to not have to use violence. For known perpetrators, "grooming" or "manipulation" are used to gain access to children. She explained how a child victim would normally act during the process and what a child may fear as consequences to a disclosure. Power discussed manipulation (threats or bribes) used to prevent a disclosure and disclosure differences when a perpetrator is known versus unknown. With a known perpetrator, it is not uncommon for a disclosure not to be made for an extended period of time, but "the disclosure process is highly dependent on whether the child feels like they have control in getting it to stop, that's their goal." Power also explained that because the abuse has often gone on "for a while," the forensic interview is not necessarily emotional, but children "get very emotional" when addressing "the disclosure process and who they had to tell," "[a]nd it's usually the nonoffending caregiver or their family."

Power was questioned about false disclosures, where a child makes an accusation of sexual assault that did not happen. She said that it is "not unusual for children to lie" in general, but "several studies" reviewed 180,000 cases of child sexual abuse and only "1 to 2 percent" of those were false allegations. Power was also questioned about false denials. A false denial is when they say something did not happen, even though it did happen. "A false denial is when they do research and they find out that through an alternate confirmation, sexual assault exam, presence of a sexually transmitted disease that should not be on a child, we know that there's been sexual contact," but "the child in over half of those cases, 50 percent of the cases still deny that sexual abuse occurred." Power stated, "False denials are much more prevalent than false allegations."

Power conducted the forensic interview of D.D. on August 4, 2016, and she described D.D.'s demeanor during the interview as "calm." Nash then objected "to all the questions about the interview with Ms. Power"; the district court said Power could testify about D.D.'s demeanor but could not testify about what D.D. said "because that would be hearsay and the child has already testified." Power then continued to testify, stating that D.D. "was uncomfortable about having to come in and talk to a stranger about her disclosure," but D.D. was "not under any acute distress"; an interview would not have been performed if D.D. was under acute distress. D.D. also underwent a SANE exam.

After Power's testimony, Nash orally moved for a mistrial, arguing that Power was qualified to testify "to generalities" but had testified about the "interview itself" resulting in an "extremely prejudicial" effect. The district court denied that motion, saying Power "went through

various factors," but did not cover "any of the specifics of the actual interview." Nash renewed his objection to Power as an expert witness; it was denied. The following day, Nash orally renewed his motion for mistrial. Nash was "not necessarily disputing" Power's qualifications as an expert. Nash argued, with respect to Power testifying in this case, "since she's the one that did the interview, [it] is highly prejudicial in light of her testimony. It's only in 1 maybe 2 percent of the cases does a child lie on their -- in their interview." He asserted Power was essentially "a witness solely for the purpose of saying, Yep, she's true -- what she said is right." After taking the matter under advisement, the district court overruled Nash's motion.

### (iv) Displayed Exhibits

Exhibits displayed to the jury included D.D.'s underwear which a law enforcement officer testified were the "purple and green lace underwear" he found in D.D.'s room and collected for evidence on August 4, 2016, the sexual assault evidence collection kit from D.D., two buccal swabs from Nash, and blue checkered boxers which the law enforcement officer testified he found in the master bedroom closet of the residence on August 4. Photographs of the same were also received.

The same law enforcement officer who collected evidence on August 4, 2016, said one exhibit was a photograph he took of D.D.'s underwear found during his investigation; D.D. recognized that exhibit as depicting her bed and her underwear she was wearing the night of the incident. The officer also said another exhibit was a photograph he took of "the blue checkered boxer shorts" he located and collected as evidence; D.D. recognized that exhibit as showing Nash's "boxers" she had found in her bedroom the morning after the incident.

### (v) Danielle Oshlo

Danielle Oshlo is a forensic scientist in the biology unit at the Nebraska State Patrol Crime Lab. The district court received Oshlo's testimony as "expert testimony." Oshlo testified she performed DNA testing on various pieces of evidence in this case (sexual assault evidence collection kit from D.D., D.D.'s underwear, Nash's boxer shorts, and a "reference buccal cell swab" from Nash). Oshlo recognized an exhibit as D.D.'s underwear that Oshlo tested and another exhibit as the boxer shorts belonging to Nash that she tested. Oshlo used a "blood slide card" from the sexual assault evidence collection kit as a reference sample for D.D.'s DNA. And Oshlo used a portion of the buccal cell swabs from Nash as reference samples for Nash's DNA. Oshlo swabbed the interior front panel and "interior crotch region" of D.D.'s underwear to collect any trace or touch DNA that was present. She also used an alternative light source to look for any body fluids and mark stains to be tested; all tested stains were negative for semen, but a presumptive test indicated the presence of saliva. Oshlo swabbed the "interior crotch region" of Nash's boxer shorts for any touch or trace DNA that was present. And she observed the boxer shorts under an alternative light source and marked any stains; multiple stains tested positive for semen. A microscopic test for semen on the swab from the "interior crotch region" of Nash's boxer shorts confirmed the semen and she "took that swab on for DNA."

Oshlo's conclusions from DNA testing the swabs of D.D.'s underwear and Nash's boxer shorts are in her lab report dated August 14, 2017. As to the swab of D.D.'s underwear, Oshlo concluded that D.D. was "included" as the major contributor of DNA and Nash was "included" as

the minor contributor; in other words, Nash's DNA was detected in the interior regions of D.D.'s underwear. Oshlo could not state the exact source of Nash's DNA, i.e., what body fluid or skin cells that DNA came from. The probability of randomly selecting an unrelated individual with the DNA profile of the minor contributor is approximately 1 in 466 quadrillion. For the epithelial (nonsperm cell) swab of Nash's underwear, Oshlo found a mixture of two people contributed approximately the same amount of DNA. Because Oshlo had "reason to believe that . . . Nash would contribute DNA to his own underwear," she "took the mixture of sample from the evidence, [she] subtracted out [Nash's] profile from that evidence which was Contributor 1 and . . . it left [Oshlo] with a Contributor 2 profile." D.D. was "included as Contributor 2 on the interior crotch region" of Nash's underwear, meaning her DNA was present; the "[p]robability of randomly selecting an unrelated individual with the DNA profile of the second contributor is approximately 1 in 9.37 octillion." When asked if an equal amount of mixture of each contributor's DNA on the evidence indicates more of a prolonged exposure "as opposed to just a one time picking it up and touching that piece of evidence," Oshlo responded, "I would say that's more likely, yes." On cross-examination, Oshlo acknowledged that DNA can be transferred from one item of clothing to another one if a sample is wet. "[I]f there are [sic], for example, a wet stain on one item of evidence or one pair of boxers, let's say, touching another piece of clothing, it's more likely that that wet stain will transfer onto the other piece of clothing."

### (b) Defense's Evidence

Nash testified that on the evening of August 1, 2016, D.D.'s mother "went out" to her friend's house and then "came back and picked up [D.D.]" and they left. D.D. and her mother came back around 2:30 or 3 a.m., and her mother went to her room. Nash was watching a movie in the living room. Once he finished the movie, he noticed his other movie was missing. He went to D.D.'s room because he knew the missing movie was there. As he walked in her room, Nash saw D.D. "try to hide something." He saw "a cup with [what] looked like orange juice" and when he picked it up he could smell it and he "knew it was liquor." He did not take it away from D.D. because he "didn't care." Nash left her room, but told D.D. he "would come back and check on her." He returned to D.D.'s room around 4:30 a.m., and when he opened the door he saw D.D. throwing up. He "picked her up, put her on the floor," and "clean[ed] up." He went to get D.D. another blanket as D.D. had thrown up on her blanket. When Nash came back, D.D. was "taking off her pajamas and her clothing," and she threw them in a pile (along with bedding Nash piled up). He wrapped the blanket around D.D. and put her on the bed. He denied ever licking D.D.'s vagina or touching her sexually. He also denied leaving his boxers on her floor. He acknowledged previously having given $100 to D.D., but said it was so that she could go school shopping.

### 3. JURY VERDICT AND CONVICTION, SENTENCING, AND POSTTRIAL PROCEEDINGS

On January 12, 2018, the jury found Nash guilty of third degree sexual assault of a child. On March 6, the district court sentenced Nash to 3 years' imprisonment, with 334 days' credit, and 18 months' postrelease supervision. Nash was ordered to register as a sex offender for 25 years. Nash's subsequent motion for new trial was overruled, and he appeals.

## III. ASSIGNMENTS OF ERROR

Nash claims, consolidated and restated, that the district court erred in (1) overruling his oral plea in abatement without a hearing, (2) refusing to order a change in venue due to pretrial publicity, (3) permitting Power to testify as an expert witness, and (4) imposing an excessive sentence. Additionally, Nash claims his trial counsel provided ineffective assistance.

## IV. STANDARD OF REVIEW

An appellate court reviews the denial of a motion to change venue for abuse of discretion. See *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018).

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. PLEA IN ABATEMENT

Nash claims the district court erred in overruling his "oral plea in abatement" without a hearing. Brief for appellant at 3. Nash's initial trial counsel filed a plea in abatement which was overruled in January 2017, and then that trial counsel withdrew in February and new trial counsel was appointed. Nash claims that his new trial counsel orally moved for a plea in abatement in September. Nash takes issue with the September plea in abatement, stating: "On September 25, 2017, [his trial counsel] orally moved for a plea in abatement and the court received as evidence the transcript from the previous preliminary hearing[,]" and "[w]ithout another preliminary hearing, the court overruled the plea in abatement." *Id.* at 15. He claims the court's "actions deprived [Nash] of his right to a preliminary hearing on the charges against him." *Id.* That is the full extent of his argument.

Based on the record before us, we conclude that the plea in abatement Nash complains about is from a different case (CR 17-223), which was pending against Nash at the same time this case (CR 16-377) was ongoing. At a hearing on August 28, 2017, the district court indicated case No. CR 17-223 involved a charge against Nash of "assault by a confined person"; Nash pled not guilty to that charge as subject to his plea in abatement, which the district court noted had been "filed" on "CR 17-223." The district court indicated the matter of Nash's plea in abatement in case No. CR 17-223 would be taken up on September 25. During a hearing on September 25, the court asked Nash's counsel whether the pending plea in abatement was "on the new case." Nash's

counsel answered, "[I]t is, Your Honor. It's 17-223--excuse me. Twenty-three." The district court heard argument from the parties on that matter and then took it under advisement before turning to matters related to this case (CR 16-377). On October 2, the court said it had overruled the "plea in abatement on the assault on a confined person."

Nash's claim has no relation to the case that is the subject of this appeal, so we do not address it further. See *State v. Huston*, 298 Neb. 323, 903 N.W.2d 907 (2017) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

## 2. CHANGE IN VENUE

Nash claims the district court abused its discretion in denying his motion for a change in venue. He argues "several jurors stated they were either familiar with the case from media reports or that they knew the alleged victim and her mother, who was also a witness." Brief for appellant at 9. He specifically identified four jurors: "Juror No. 7 read something about the case in the newspaper"; "Jurors Nos. 42 and 14 knew both DD and her mother"; "DD had been a visitor in Juror No. 14's home and is friends with her daughter"; and "Juror No. 50 works in a doctor's office where both DD and her mother are patients." *Id*. at 9-10. Nash contends that as a result, the entire jury pool was "tainted by prejudice, whether expressed or not." *Id.* at 10. He asserts that "[a]lthough the jurors may honestly have believed that the pretrial publicity would not affect their opinions, the crime of which [he] was accused was a significant event in the small town where it occurred," and the court should have been "presumed" the jury pool could not render a fair and impartial verdict. *Id.*

Neb. Rev. Stat. § 29-1301 (Reissue 2016) states, in relevant part, "[a]ll criminal cases shall be tried in the county where the offense was committed . . . unless it shall appear to the court by affidavits that a fair and impartial trial cannot be had therein." The State argues, "In this case, there were no affidavits, no testimony, no evidence of any kind which would have supported a change of venue prior to trial." Brief for appellee at 5.

Under most circumstances, voir dire examination provides the best opportunity to determine whether a court should change venue. *State v. Schroeder*, 279 Neb. 199, 777 N.W.2d 793 (2010). A court will not presume unconstitutional partiality because of media coverage unless the record shows a barrage of inflammatory publicity immediately prior to trial, amounting to a huge wave of public passion or resulting in a trial atmosphere utterly corrupted by press coverage. See *id*. If such a presumption is not warranted, a change of venue is evaluated under the following factors: (1) the nature of the publicity, (2) the degree to which the publicity has circulated throughout the community, (3) the degree to which the publicity circulated in areas to which venue could be changed, (4) the length of time between the dissemination of the publicity complained of and the date of the trial, (5) the care exercised and ease encountered in the selection of the jury, (6) the number of challenges exercised during voir dire, (7) the severity of the offenses charged, and (8) the size of the area from which the venire was drawn. See *State v. Dixon, supra*. To warrant a change of venue, a defendant must show the existence of pervasive misleading pretrial publicity. *Id.* So, to secure a change of venue based on pretrial publicity, a defendant must show that the publicity has made it impossible to secure a fair and impartial jury. *Id.*

Upon Nash's renewed motion to change venue post-selection of the jury panel, the district court denied the motion, stating:

> [W]e only had one juror who initially said that she had read something about the case. Then as we went further into the questioning of the jurors that juror indicated that she was thinking of another case and was not thinking of this particular case.
>
> So there's been no evidence that there has been any pretrial publicity that has poisoned the mind of the jurors[.]

Our review of the record reveals that only Juror No. 7 remembered seeing "something" in the newspaper about the case, but the juror later clarified that she "was mistaken" and "was thinking of another case." Nash's counsel asked Juror No. 7 what articles she had read, but she was not certain and thought "maybe the last time [sic] was close to this last name. But it wasn't the same." The juror never expressed an opinion about Nash's guilt or innocence. Even assuming that juror read articles about Nash or this case, mere exposure to news accounts of a crime does not presumptively deprive a defendant of due process. See *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011). Nash neither referred to specific media reports in his appellate brief or the proceedings below, nor did he offer any media accounts in prior proceedings. Without the ability to review any alleged inflammatory publicity, we cannot conclude that a presumption of unconstitutional partiality corrupted Nash's case. See *State v. Schroeder, supra* (defendant offered five articles and printout of online commentary to one of those articles; presumption of prejudice nevertheless inapplicable and no abuse of discretion found in denial to change venue).

The nature of the publicity was described only generally when Nash initially moved for a change of venue regarding "a number of reports published in the paper with regard to [Nash's] arrest, a re-arrest when there was a violation of bond." Although unable to analyze any alleged articles, we note "[p]ress coverage that is factual cannot serve as the basis for a change of venue." *State v. Dixon*, 282 Neb. at 282, 802 N.W.2d at 877 (defendant offered many news accounts of crimes and his arrest; articles mentioning him generally recounted allegations of assault of victim and other assaults in which he was suspect; no abuse of discretion in denying change of venue as coverage was factual and not inflammatory). Nothing in our record shows when the alleged publicity was disseminated in relation to Nash's trial, and there was nothing to show the degree of circulation of alleged publicity in any community.

The jury was chosen in the interest of preserving impartiality for both parties. After voir dire of the jury venire, one of the parties struck Juror No. 7 from inclusion on the jury panel, and during voir dire the district court excluded the other three jurors of whom Nash complains on appeal (one worked for a Bridge of Hope physician; others had children who were D.D.'s friends). Both parties passed the jury for cause, and Nash did not challenge any of the prospective jurors from disqualification of the jury panel prior to passing the jury for cause; therefore, Nash waived any challenge he may have had to the persons actually selected as jurors. See *Howard v. State Farm Mut. Auto. Ins. Co.*, 242 Neb. 624, 496 N.W.2d 862 (1993) (party failing to challenge seating of venireperson as juror, who subsequently passes venire panel for cause, thereby waives any objection that might otherwise have existed to seating of unchallenged venireperson as juror). Because Nash has not established that publicity, if any, made it impossible to secure a fair and

impartial jury, the district court did not abuse its discretion in denying his motion to change venue. See *State v. Dixon, supra*.

### 3. EXPERT WITNESS TESTIMONY

Nash claims the district court erred in allowing Power to testify as an expert. At the hearing to qualify her as an expert, Power testified that she obtained undergraduate and master's degrees in anthropology, with a primary focus on forensics. From 1997 to 2003, Power was employed at Bridge of Hope, a non-profit agency that coordinates child abuse investigations, including those involving allegations of child sexual assault. Although Power left her employment at Bridge of Hope in 2003, she remained a sexual assault advocate there through 2012 and was on their board and was president of their board. From 2003 to 2012, she was employed as a probation officer for the State of Nebraska; during that time she handled a caseload for domestic violence and sexual assault and she received training on how to respond to victims of domestic violence and sexual assault. From 2012 until 2017, Power served as Executive Director of Bridge of Hope and also became a certified forensic interviewer. Power had hundreds of hours of training and education at Bridge of Hope that covered child abuse and child abuse investigations, taught her how to respond to child victims of sexual abuse, and covered the generalities of childhood sexual abuse. Since August 1, 2017, Power has been the coordinator for the Midwest Problem Solving Court for state probation in Nebraska. The district court did not abuse its discretion by concluding Power's training and experience qualified her to testify as an expert witness "as to sexual abuse in generalities."

Nash also takes issue with the fact that Power is not a psychologist, but was permitted to testify as to D.D.'s "state of mind or demeanor" during D.D.'s interview at Bridge of Hope. Brief for appellant at 14. However, as the State correctly argues, "It does not take an expert to testify regarding someone's demeanor" as "[a]ll it takes is the ability to observe and to verbalize those observations." Brief for appellee at 13. See Neb. Rev. Stat. § 27-701 (Reissue 2016) (lay witnesses may testify in form of opinions or inferences which are rationally based on witness' perception and are helpful to clear understanding of testimony or determination of fact in issue). Power only described D.D.'s demeanor during the Bridge of Hope interview, which was based on Power's observation while conducting that interview.

Nash also argues that because of the percentages provided by Power (75 percent of sexual abuse cases committed by persons known to victim; only 1- to 2-percent of child abuse cases involve false allegations), along with Power having interviewed D.D., Power's testimony "improperly implied that [D.D.] was being truthful when she accused [Nash] of sexual assault, and that he was guilty of the crime." Brief for appellant at 8. Nash contends that Power was "permitted to testify beyond just the general behavior exhibited by sexually abused children" as authorized by case law. *Id*. at 14. We note that Nash did not object when Power testified during trial about different percentages, and Nash does not now assert that specific testimony was inadmissible. Rather, he asserts because Power had been D.D.'s forensic interviewer, her testimony regarding percentages "permitted the jury to infer that [Nash], who was known to [D.D.], was likely guilty of the crime and that [D.D.] was being truthful when she made the accusation." *Id.* at 15.

- 11 -

Neb. Rev. Stat. § 27-702 (Reissue 2016) provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Upon qualifying Power as an expert witness, the district court noted Power's lack of university training in psychology, but found her experience as a probation officer and Executive Director of Bridge of Hope qualified her as an expert. The court recognized Power's 350 hours of training in child sexual abuse, her certification as a forensic examiner having conducted over 200 forensic interviews, and her approximately 150 hours of continuing education per year while serving as Executive Director. In light of her background, the court did not abuse its discretion in concluding Power was qualified to testify generally about child sexual abuse.

In *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992), the Nebraska Supreme Court found an expert's testimony admissible where the expert testified about symptoms, behavior, and feelings generally exhibited by children who have been sexually abused. The expert testimony was not premised on an examination of the victim, but was relevant to assist the trier of fact in understanding and determining the issue in the victim's case (whether defendant had sexually assaulted victim), and therefore, it came within the requirements of § 27-702. The reasoning for allowing an expert to testify about sexual abuse in generalities is that few jurors have sufficient familiarity with child sexual abuse to understand the dynamics of a sexually abusive relationship and the behavior exhibited by sexually abused children is often contrary to what most adults would expect. See *State v. Roenfeldt, supra*. Similar testimony was upheld by this court in *State v. Bruna*, 12 Neb. App. 798, 686 N.W.2d 590 (2004), in which an expert testified about factors to consider in evaluating the veracity of a child's sexual abuse claims and about the types of behavioral and emotional changes that a victim of sexual abuse may exhibit.

Testimony about the profile of a child abuse victim is admissible not to prove abuse of the child, but to explain certain behaviors of the child and to rebut the implied or express defense assertion that the child is lying. See *State v. Doan*, 1 Neb. App. 484, 498 N.W.2d 804 (1993). However, in a prosecution for sexual assault of a child, an expert witness may not give testimony which directly or indirectly expresses an opinion that the child is believable, that the child is credible, or that the witness' account has been validated. See *id. (*expert's validation testimony impermissible as direct comment that alleged victim's account of abuse was believable and credible).

We do not view Power's discussion of percentages to explain child sexual assault or Power's having conducted the forensic interview of D.D. as directly or indirectly expressing any impermissible validation of D.D.'s truthfulness or Nash's guilt. We note that in *State v. Doan, supra,* the testifying expert had interviewed the alleged victim; however, we emphasized that the expert crossed the permissible line of testimony when attesting to the alleged victim's credibility. Power's stated percentages were merely part of a general discussion that was not connected to the facts of this case. Power neither opined about whether D.D. had been sexually assaulted, nor did she testify about what was said during D.D.'s interview or about D.D.'s credibility in any context. Power's testimony largely consisted of explanations of generalities.

The extent of any specific testimony about D.D. was Power's comments that D.D. had a "calm" demeanor in meeting for the interview, D.D. was "uncomfortable" to be interviewed but not under "acute distress," and D.D. had a SANE exam. But Power did not explain that testimony to directly or implicitly encourage a conclusion of D.D.'s veracity or Nash's guilt. The district court did not abuse its discretion in admitting Power's expert testimony, because it was helpful to assist the jury in understanding and determining a main issue of the case. See *State v. Roenfeldt, supra*.

## 4. EXCESSIVE SENTENCE

Nash argues his sentence is excessive. Nash was convicted of third degree sexual assault of a child, a Class IIIA felony, pursuant to § 28-320.01. A Class IIIA felony is punishable by up to 3 years' imprisonment and 18 months' post-release supervision, a $10,000 fine, or both; there is no minimum term for imprisonment, but there is a minimum of 9 months' postrelease supervision if imprisonment is imposed. See Neb. Rev. Stat. § 28-105 (Reissue 2016). The district court sentenced Nash to 3 years' imprisonment, with 334 days' credit for time served, and 18 months' post-release supervision, which is within the statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.*

Nash was 36 years old at the time of the offense. Nash's presentence investigation report (PSR) reveals Nash's long criminal history. Dispositions of several charges were unavailable (among those were one charge of simple assault, four charges of assault, and one charge of domestic violence assault). Nash has convictions for: reckless manslaughter; assault-menacing (four counts); illegal discharge of a firearm; misdemeanor assault; driving under the influence; driving under restraint-alcohol related; false reporting; and harassment-strike, shove, or kick. A domestic abuse protection order was issued against Nash related to this case in 2016. He was arrested twice for parole violations. While this case was pending, he was involved in two other criminal cases, and charged with four crimes; he was found not guilty of one of the charges and the other three charges were dismissed.

As part of the presentence investigation, the probation officer conducted a level of service/case management inventory. Nash was assessed at a "high risk" to reoffend. Nash scored in the "High" risk range for the following domains: family/marital, leisure/recreation, and companions. He scored in the "Medium" risk range in the following domains: criminal history, education/employment, alcohol/drug problem, and pro-criminal attitude/orientation. Nash scored in the "high risk range overall" on the Vermont Assessment for Sex Offender Risk. The PSR states

Nash "made no mention of his prior arrests for assault, specifically sexual assault" (he was acquitted of a felony sexual assault of a child in 2015 in Colorado). Nash denied wrongdoing and any sexual contact related to this case. The probation officer recommended imprisonment for Nash due to "the seriousness of the current offense," his "prior record and continued criminal behavior," and his "minimizations regarding the current offense and his prior record."

At the sentencing hearing, the State argued it was a "travesty that the most [Nash] can get is three years on this case considering what he did to the child" and said there was no mitigating factor to justify "anything less than the maximum." The State also noted that Nash "has shown no remorse . . . about the facts."

Nash's counsel stated Nash maintained his innocence in this case, which is why he did not show any remorse. Defense counsel asked the court to be consistent with "sentencing of others in a similar situation," and indicated that Nash believed a maximum of 2 years' imprisonment would be appropriate.

The district court acknowledged a prior attempted reckless manslaughter conviction on which Nash was sentenced to 5 years' imprisonment, and then commented on Nash's other prior convictions and his "high risk to reoffend." The court considered the circumstances of the offense, stating, "you did give the victim in this case alcohol, the victim was 14 years of age, and you did violate her trust as a stepfather for that minor child and did commit the sexual assault as found by the jury." Nash was sentenced to 3 years' imprisonment, followed by 18 months' postrelease supervision.

Nash argues the district court "focused almost exclusively on [his] prior criminal record in determining to sentence him to the maximum term of three years." Brief for appellant at 16. He asserts that the other relevant factors were not considered or properly assessed, but does not explain how any factor warranted a lesser sentence. Contrary to Nash's assertions, the district court's references to the PSR's content demonstrates it did review the PSR, which was quite detailed. The district court weighed heavily the nature of the offense and Nash's prior criminal record, and it had discretion to do so. See *State v. Leahy, supra*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*. The district court did not abuse its discretion in imposing Nash's sentence.

### 5. INEFFECTIVE ASSISTANCE OF COUNSEL

Nash claims his trial counsel was ineffective. Nash was initially represented by the public defender's office (initial trial counsel), and that office represented Nash in county court and district court proceedings until filing a "Motion to Withdraw as Counsel" on February 16, 2017, alleging that Nash wished to represent himself. On February 21, the district court issued an order allowing the withdrawal and appointing new counsel (second trial counsel) to represent Nash. On February 26, 2018, the second trial counsel filed a "Motion to Withdraw" as Nash's counsel, alleging that Nash intended to claim ineffective assistance on appeal. Under an order filed the same day, the district court allowed the second trial counsel's withdrawal and appointed new counsel to represent Nash on direct appeal.

- 14 -

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id*. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.*

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id.*

Nash claims his trial counsel was ineffective for: (1) not requesting a second DNA evaluation, (2) not presenting the video of either D.D.'s Bridge of Hope interview or Nash's interview, and (3) not requesting a separate expert psychologist to review D.D.'s taped interview. Bearing in mind the recited legal principles, we address each of Nash's claims.

(a) Second DNA Evaluation

Nash asserts that he was "highly prejudic[ed]" because his trial counsel did not attempt to obtain an order for a second DNA test to challenge the State's evidence (Oshlo's testimony). Brief for appellant at 11. Nash's only argument in support of this assertion is that the "DNA evidence in this case was extremely important and the jury likely placed significant weight on that testimony in rendering its verdict of guilty." *Id*. Nash does not state what a second DNA test would have shown, nor does he explain why the results would be any different than Oshlo's DNA testing. Nash summarizes Oshlo's findings, but does not dispute those findings nor does he take issue with any part of Oshlo's DNA testing process. A general allegation that a second DNA test should have been ordered, without more specificity as to the basis for such additional testing or any explanation for why trial counsel was deficient in not making such a request, is not sufficient to preserve an ineffective assistance of counsel claim; therefore, this claim fails. See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014) (conclusory and general allegations that counsel failed to call at least two witnesses was not sufficient to preserve ineffective assistance of counsel claim).

- 15 -

(b) Videos of D.D.'s Interview and Nash's Interview

Nash claims that because the State failed to present the video of D.D.'s Bridge of Hope interview or Nash's interview, there is an "implication" that the "tapes contained information which was harmful to the [State's] case or that was potentially exculpatory to [Nash]." Brief for appellant at 12. He alleges he did not have a fair trial because his trial counsel should have introduced those videos into evidence. Nash does not state any further information to suggest what is potentially exculpatory in either video.

D.D. testified on cross-examination that she remembered the substance of her interview with Power. Nash's trial counsel asked D.D. about what she said and did during her Bridge of Hope interview with Power. Nash's trial counsel never attempted to offer or exclude D.D.'s interview. In his claim of ineffective assistance of trial counsel, Nash does not explain what that video would show, he does not describe how any part of it would have been beneficial to his defense or on what basis it would have been admissible, and he does not specify how trial counsel was deficient by not offering it into evidence. See *State v. Golyar, supra* (ineffective assistance of counsel claim must allege deficient performance with particularity).

Also, although not clearly stated by Nash, we presume Nash's claim about his own interview refers to the one with Investigator Travis Roth, a law enforcement officer with the North Platte Police Department. Investigator Roth testified that he interviewed Nash at the police department on August 4, 2016; no other interviews of Nash are noted in the record. Nash's second trial counsel filed a motion in limine requesting the exclusion of Nash's "video-taped statement," alleging it contained "irrelevant and immaterial discussions outside the facts of this case which would be highly prejudicial and any probative value that said video would have is far outweighed by the prejudicial effect" of that video. During cross-examination and recross-examination of Investigator Roth, Nash's trial counsel challenged the investigator's account of his interview of Nash. On cross-examination of Nash, the State impeached Nash's testimony as to several details with use of a transcript of his interview with the investigator.

The purpose to be served from offering the video of Nash's interview into evidence is puzzling when Nash's version of events apparently changed in several ways by the time of trial. Viewed in relation to Nash's trial counsel's motion in limine, we conclude Nash's trial counsel's actions were strategic, not deficient. See *State v. Henderson*, 301 Neb. 633, 920 N.W.2d 246 (2018) (appellate court will not second-guess trial counsel's reasonable strategic decisions). Alternatively, this claim is also insufficiently alleged for the same reason as applied to the video of D.D.'s interview. See *State v. Abdullah, supra,* and *State v. Golyar, supra*.

For the reasons set forth above, Nash's claims of ineffective assistance of trial counsel related to these videos also fails.

(c) Expert Psychologist

Nash claims his trial counsel was ineffective in not requesting a separate expert psychologist to review D.D.'s interview. He argues that Power testified "as to the various factors that influence the credibility of a minor who has accused someone of sexual assault." Brief for appellant at 12-13. And that in light of that testimony and without testimony from "a qualified mental health expert, the jury had nothing with which to test [D.D.'s] veracity." *Id.* at 13.

Nash alleges a psychologist would have been able to review D.D.'s interview and "advise defense counsel as to the likelihood that [D.D.] was fabricating her testimony and given him insight as to how best cross-examine the [State's] expert [Power]." *Id.* Nash does not specify how that advice could have been used to cross-examine Power, or what purpose the advice would have served when Power did not opine about D.D.'s credibility. Further, cross-examining Power or a psychologist about D.D.'s credibility during D.D.'s interview would have solicited improper testimony. See *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017) (it is improper for lay or expert witness to testify whether another person may or may not have been telling truth in specific instance). Moreover, Nash's assertion that the jury had nothing with which to test D.D.'s veracity is inaccurate as the jury heard D.D.'s testimony, which included cross-examination of D.D. about her Bridge of Hope interview. See *id.* (credibility of witnesses is determination within province of trier of fact). Nash's claim of ineffective assistance of trial counsel on this basis also fails. Even if counsel was deficient as alleged, Nash would be unable to show he was prejudiced since the jury had D.D.'s own testimony from which to judge her credibility.

## VI. CONCLUSION

We affirm Nash's conviction and sentence. Further, the record is sufficient to determine his claims of ineffective assistance of trial counsel, and we conclude all his claims fail for the reasons discussed above.

AFFIRMED.