Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:08 PM CDT

State of Nebraska, appellee, v.
Kevin S. German, appellant.
___ N.W.3d ___

Filed June 14, 2024.    No. S-23-159.

1. **Judgments: Appeal and Error.** On questions of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.
2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.
4. **Trial: Rules of Evidence.** A trial court exercises its discretion in determining whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect.
5. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.
6. **Evidence: Proof.** The bar for establishing evidentiary relevance is not a high one and requires only the probative value of the evidence to be something more than nothing.
7. **Evidence: Words and Phrases.** Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.
8. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.
9. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant

has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

10. **Jury Instructions: Appeal and Error.** It is not error for a trial court to refuse to give a party's requested instruction where the substance of the requested instruction was covered in the instructions given.

11. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

12. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

13. **Criminal Law: Jury Instructions.** When there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give that instruction to the jury in a criminal case.

14. **Jury Instructions.** Parties have no right to particular language in a jury instruction; they are entitled to nothing more or less than a fair, impartial, and complete statement of the applicable law.

15. **Constitutional Law: Due Process.** The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.

16. **Effectiveness of Counsel: Postconviction: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

17. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.

18. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court

later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.

19. **Effectiveness of Counsel: Proof: Appeal and Error.** When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.

20. **Effectiveness of Counsel: Records: Appeal and Error.** Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

21. **Miranda Rights: Waiver: Self-Incrimination.** Whether or not a suspect initially waived his or her right to remain silent, the suspect retains the right to cut off questioning.

22. **Miranda Rights: Police Officers and Sheriffs: Self-Incrimination.** A suspect must articulate the desire to cut off questioning with sufficient clarity that a reasonable police officer under the circumstances would understand the statement as an invocation of the right to remain silent.

23. ____: ____: ____. Ambiguous or equivocal statements that might be construed as invoking the right to silence do not require the police to discontinue their questioning.

24. **Miranda Rights: Self-Incrimination: Appeal and Error.** In determining whether there has been a clear invocation of the right to remain silent, an appellate court reviews the totality of the circumstances surrounding the statement in order to assess the words in context.

25. **Effectiveness of Counsel: Jury Instructions.** Counsel's failure to request a novel jury instruction does not constitute deficient performance.

26. **Effectiveness of Counsel: Proof.** Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity.

Appeal from the District Court for Chase County, Patrick M. Heng, Judge. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

On direct appeal, Kevin S. German challenges an evidentiary ruling, jury instructions given and refused, a sentencing determination, and the assistance of counsel. Because a jury convicted German of second degree murder, he can show no prejudice based on the court's giving of an aiding instruction that would include unintentional manslaughter or based on not submitting to the jury whether the murder victim was safely released for purposes of the kidnapping sentence. Finding no merit to German's other arguments, we affirm the district court's judgment.

## II. BACKGROUND

A jury convicted German of second degree murder, kidnapping, and first degree false imprisonment based on two separate but related incidents occurring over a 2-day period in November 2019. In the first incident, German and his girlfriend, Keonna Carter, abducted and assaulted E.A. In the second incident, German and Carter abducted, assaulted, and killed Annika Swanson. Before summarizing the evidence pertaining to the crimes, we provide background concerning the perpetrators, victims, and a witness.

### 1. Individuals Involved

Though in different grades, German, Swanson, and E.A. attended high school together in Imperial, Nebraska, during the 2013-14 school year. Toward the end of the school year, German and E.A. began an intimate relationship. Although German moved out of town after graduating, he communicated with E.A. "off and on" and they would meet when German returned to the area.

Fast forward to the summer of 2019. Swanson began dating and living with Russ Mann. Mann described his trailer as "a place where people go to use drugs and procure drugs." He and Swanson used methamphetamine daily.

German, who lived in Louisiana, met and began a relationship with Carter, who lived in Fort Collins, Colorado. They remained in near-daily communication through electronic means. Later, Carter falsely told German that he had impregnated her.

Also that summer, E.A. sought to reconnect with German. They traveled to California and Louisiana and resumed a sexual relationship. During their trip, German received a telephone call from Carter. German told E.A. that Carter was pregnant with his children and that he was going to be involved with his children even though he and Carter were not together. German also told E.A. that Carter was dangerous and had killed people.

In September 2019, German and E.A. returned to Imperial. German and E.A. both sold drugs, and E.A. introduced German to Mann. Over the next couple of months, German and Mann "would work trades together" where Mann would give German methamphetamine in return for cocaine.

While German and E.A. were living together in Imperial, E.A. suspected that German remained in a relationship with Carter. E.A. saw German send a message to Carter stating that E.A. was just a friend whom he was helping and that she was "delusional and crazy." E.A. subsequently ended the relationship and told German that he could be with Carter.

In approximately October 2019, German called Carter and asked her to pick him up in Imperial. She did so. German told her that he had grown tired of helping out his friend, E.A., whom he had a relationship with "back in the day." He denied having had a recent relationship with E.A. Before leaving Imperial, German and Carter went to Mann's trailer. There, Carter met Swanson.

German and Carter began living together in Fort Collins. They made return trips to Imperial—specifically, to Mann's trailer—to bring drugs. Carter recalled that during one trip in October 2019, German drove her to his family's property, which was located several miles south of Imperial.

On numerous occasions, Carter did not accompany German to Imperial. On one such occasion—October 16, 2019—German and Carter exchanged messages about Swanson. German wrote, "Yup may test the trunk today" and "Yea [expletive] women out here need to know they can be lost in 5 seconds." German indicated that Swanson "may be in some trouble with our good friend" because Swanson was "a busy body" and was "talkin to some ppl that owe us money."

## 2. Events Leading to
### Abductions and Death

On November 11 or 12, 2019, German and Carter acquired drugs in Colorado and traveled to Mann's trailer. Swanson was at the trailer, and German expressed to Carter frustration with Swanson's inability "to keep her mouth shut."

On the evening of November 12, 2019, E.A. sent messages to Swanson, seeking to procure drugs. Swanson told German, in Carter's presence, that "his girlfriend" was "messaging" her. Carter saw that the messages were from E.A. Using Swanson's phone and texting as her, German set up a meeting with E.A. German and Carter arrived at the meeting location, and German told E.A. to get in the car.

According to E.A., German took her cell phone when she got in the car. He pulled out a gun and began driving. German said E.A. owed him money and needed to learn to keep her mouth shut. Carter yelled at E.A. and hit her. As German drove, Carter recognized that they entered the German family property.

German parked the car and ordered E.A. to get out. Carter then hit E.A. in the face and stomach. German grabbed E.A. and threw her against the car. German and Carter each kicked

E.A. German gave E.A. the choice to be either killed or "prostituted out." After E.A. agreed to be a prostitute, they then returned to Mann's trailer.

On the morning of November 13, 2019, Mann and German left the trailer. Carter was given a gun and told to keep Swanson and E.A. at the trailer. That afternoon, a deputy sheriff knocked on the door of the trailer; no one answered. German arranged for Carter to go elsewhere for a while. After several hours, Carter sent messages trying to find someone to retrieve her. German sent a message offering to "come to you and leave them there," and Carter responded, "NOW THAT'S [expletive] STUPID AS HELL!" A few minutes later, Carter sent a message stating, "Stay with your sluts I'm over this," and German replied, "Nah . . . I'll splatter them and come to you." Instead, German had Mann pick Carter up and return with her to the trailer.

At some point, Swanson and Carter spoke alone. Swanson told Carter that German and E.A. had a relationship, which Swanson assumed to be sexual, in September and October 2019. Carter became angry and told German that they needed to leave. Mann agreed to keep watch over E.A. and "make sure she's doing what she has to do to make [German's] money back."

German and Carter left to return to Fort Collins. Carter, upset and yelling, told German what Swanson said about his relationship with E.A. German said that Swanson was lying. Upset, he made a U-turn and sped back to Mann's trailer.

German entered the trailer. According to E.A., German appeared to be "filled with pure rage" and was "the angriest [she had] ever seen him." German grabbed Swanson, hit her, and threw her to the ground. He dragged Swanson out of the house and threw her off the porch. German then picked Swanson up, put her in the back of the car, and drove away.

German pulled the car to the side of a road after Swanson said something that upset him. He pulled Swanson from the car, hit her face, and held her down on a gravel road. Carter

kicked Swanson and stepped on the side of her neck for 10 to 15 seconds. Carter described that Swanson's "pulse just got weak." German then put Swanson in the trunk of the car.

German drove to three locations. The first had a locked gate, so German said they would go somewhere else. Carter described the second location as "an outlook area" or "little cliff" on a bumpy dirt road. The last location was on the German family property. The road was bumpy, and Carter heard Swanson moan and say "'ow.'" German drove the car toward a vertical pipe that protruded from the ground and popped the trunk.

Swanson got out of the trunk and asked "why couldn't she have the same deal [E.A.] did." Carter heard German tell Swanson to drink something. Carter testified that she had a container of windshield wiper fluid in the car. German then told Swanson to get inside the pipe. Eventually, Swanson entered the pipe. Carter observed German lighting on fire items, including paper and a glove, to throw into the pipe. She heard Swanson repeatedly saying "'no.'" German and Carter returned to Mann's trailer, and Carter heard German tell Mann that Swanson was somewhere no one would find her.

### 3. Investigation

On November 21, 2019, Swanson's father reported to the Chase County sheriff's office that he had not heard from Swanson for approximately 1 week. Law enforcement interviewed Mann and E.A. After E.A. "spilled the beans," officers sought search warrants for some of the German family property and sought arrest warrants for German and Carter.

Officers from the Fort Collins Police Department arrested German and Carter. During a custodial interview, Carter tried to explain how to find Swanson by describing locations and surroundings. Law enforcement eventually found the location.

The vertical pipe was part of a culvert system. It was 24 inches wide and connected below ground into a horizontal structure that was 18 inches wide. The pipe protruded

approximately 3 feet 6 inches out of the ground and was approximately 8 feet total in depth. Swanson's deceased body, which was measured at 5 feet 10 inches, was found inside the horizontal structure connected to the bottom of the vertical pipe.

Officers located several pieces of evidence near the culvert system. Those items included a clear plastic bottle with "some sort of coagulated substance in the bottom," grass or soil that appeared to be wet or oily, and a blue plastic lid. Items found inside the culvert included an oily substance, a vegetable oil bottle lacking a blue lid, a sweatshirt, and pages from a Colorado library book.

Law enforcement searched Carter's vehicle and apartment. In the trunk of the vehicle, a detective found a clump of hair, a hubcap with an apparent bloodstain, a bottle of "jack oil," and a library book, which was missing the first 32 pages. In Carter's apartment, officers located E.A.'s cell phone.

Brandy Porter, a forensic scientist, received DNA reference samples for Swanson, Carter, and German. She swabbed around the rim of the clear plastic bottle, and the DNA profile on the swab was a partial mixture of three people. Carter and Swanson could be included as a contributor to the sample, but German was excluded as a contributor. Porter developed a DNA profile on the container of vegetable oil, which showed that Swanson was included in the DNA profile but that German and Carter were excluded. Porter cautioned that a person does not always leave DNA when he or she touches something, so it would be improper to conclude that a person did not handle an item just because that person's DNA was not found on it.

Testing showed the substance inside the clear plastic bottle to contain methanol. Toxicology testing revealed that Swanson had methanol, formic acid, amphetamine, and methamphetamine in her system. Formic acid is formed if methanol is ingested. Windshield wiper fluid contains methanol.

### 4. Medical Expert Testimony

A pathologist opined that the cause of Swanson's death was blunt force head injuries and methanol and methamphetamine toxicity. Swanson's subdural hemorrhages were consistent with blunt force trauma that could be caused by downward pressure of a foot on the side of the head or by being kicked in the side of the head. The pathologist believed that the methanol was at a fatal level and that the level of methamphetamine was a contributing factor to Swanson's death.

An expert witness called by the State testified that the methanol concentration in Swanson's system was approximately 1,000 times higher than normal. Although he did not believe Swanson's death was due solely to methanol, he believed that it played a "causative role" and that methamphetamine ingestion was a contributing factor to Swanson's death.

The defense's expert witness opined that it could not be concluded with reasonable medical certainty that methanol ingestion caused or contributed to Swanson's death. The expert explained that Swanson had an elevated methanol level, but that her level of formic acid was normal. And methanol itself is not toxic, only the metabolite—formic acid—is toxic. He opined that Swanson had not yet become poisoned by the methanol at the time that she died.

### 5. Verdict and Sentencing

The jury found German guilty of murder in the second degree of Swanson, guilty of kidnapping Swanson, and guilty of first degree false imprisonment of E.A. The court accepted the jury's verdicts and entered judgment.

The court imposed sentences of 60 to 80 years' imprisonment for murder in the second degree, life imprisonment for kidnapping, and 30 to 36 months' imprisonment for first degree false imprisonment. It ordered that the kidnapping sentence be served concurrently to the murder sentence and that the false imprisonment sentence be served consecutively to the other two sentences.

Through counsel different from trial counsel, German appealed.

## III. ASSIGNMENTS OF ERROR

German assigns 11 errors. He alleges that the district court erred in (1) admitting photographic evidence of Swanson's child, (2) giving instructions on aiding and abetting a crime and refusing to give his tendered instructions, and (3) imposing a sentence of life imprisonment for kidnapping in violation of *Alleyne v. United States*[1] and the federal and state Constitutions. German also alleges eight instances of ineffective assistance of trial counsel.

## IV. STANDARD OF REVIEW

[1] On questions of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.[2] Additional standards of review will be set forth, as appropriate, in the analysis.

## V. ANALYSIS

### 1. RECEIPT OF EVIDENCE

German argues that admission of photographic evidence of Swanson's child denied him a fair trial and violated due process. He contends that the exhibit contained irrelevant evidence and was unfairly prejudicial.

### (a) Standard of Review

[2-5] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[3] Where the Nebraska Evidence Rules commit the

---

[1] *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013).

[2] *State v. Lear, ante* p. 14, 2 N.W.3d 632 (2024).

[3] *State v. Anthony, ante* p. 308, 4 N.W.3d 393 (2024).

evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[4] A trial court exercises its discretion in determining whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect.[5] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[6]

(b) Additional Facts

The fourth witness called by the State, the father of one of Swanson's children, testified about his efforts to keep Swanson involved in their young child's life. Those efforts included sending messages to Swanson with pictures and videos of their child. A trial exhibit contained photographs of the messages sent to Swanson between November 12 and November 15, 2019.

Before the State offered the exhibit into evidence, a sidebar conference occurred. Defense counsel objected that pictures of the child lacked relevance, were unfairly prejudicial, and were cumulative. The prosecutor asserted that the purpose of the exhibit was to show that Swanson opened a message on November 12, 2019, but did not open messages sent November 13 and later. Defense counsel offered to stipulate to Swanson's receiving but not opening messages, but the prosecutor remarked on the State's burden of proof. The court overruled the objection.

When the State subsequently offered the exhibit into evidence, defense counsel renewed the objection. The court

---

[4] *Id.*

[5] *State v. Lorello*, 314 Neb. 385, 991 N.W.2d 11 (2023).

[6] *State v. Anthony, supra* note 3.

overruled the objection and received the exhibit. Counsel did not request a limiting instruction.

### (c) Discussion

#### (i) Relevance

[6] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[7] The bar for establishing evidentiary relevance is not a high one and requires only the probative value of the evidence to be something more than nothing.[8]

Here, as an element of the offenses, the State had the burden to prove when German abducted and killed Swanson. When Swanson received and opened a message, received but did not open a message, or did not receive a sent message was probative of this element. The district court did not abuse its discretion in overruling German's relevancy objection.

#### (ii) Unfair Prejudice

[7] Under Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice." Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.[9]

German argues that "[d]isplaying for the jury the face of a motherless child four times was a preventable and emotional distraction which unnecessarily risked having jurors consider impermissible passions and emotions as part of their deliberation."[10] But these photographs of Swanson's child—whose life Swanson "walked out of"—do not somehow

---

[7] Neb. Rev. Stat. § 27-401 (Reissue 2016).

[8] *State v. Lorello, supra* note 5.

[9] *State v. Abligo*, 312 Neb. 74, 978 N.W.2d 42 (2022).

[10] Brief for appellant at 25.

suggest that German murdered Swanson. We conclude the district court did not abuse its discretion by admitting the exhibit into evidence.

## 2. JURY INSTRUCTIONS

German contends that the court erred by refusing to give the instructions that he tendered on aiding a crime and by giving incorrect jury instructions.

### (a) Standard of Review

[8] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.[11]

[9,10] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[12] It is not error for a trial court to refuse to give a party's requested instruction where the substance of the requested instruction was covered in the instructions given.[13]

[11] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.[14]

[12] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[15]

---

[11] *State v. Npimnee, ante* p. 1, 2 N.W.3d 620 (2024).

[12] *State v. Johnson*, 314 Neb. 20, 988 N.W.2d 159 (2023).

[13] *State v. Mann*, 302 Neb. 804, 925 N.W.2d 324 (2019).

[14] *State v. Tvrdy*, 315 Neb. 756, 1 N.W.3d 479 (2024).

[15] *State v. Npimnee, supra* note 11.

### (b) Additional Facts

### *(i) Instructions Given*

#### a. Homicide

In connection with the charge of first degree murder, the court instructed the jury that it could find German guilty of murder in the first degree, murder in the second degree, or manslaughter. The jury instruction stated in relevant part:

#### MURDER IN THE SECOND DEGREE

The elements which the State must prove beyond a reasonable doubt in order to convict [German] of Murder in the Second Degree are:

. . . .

1. That [German], either independently or while aiding and abetting another, did kill . . . Swanson; and

2. That [German], either independently or while aiding and abetting another, did so intentionally, but without premeditation; and

3. That [German], either independently or while aiding and abetting another, did so without the provocation of a sudden quarrel; and

4. That [German] did so on or about or around the dates of November 12, 2019 to November 21, 2019, in Chase County, Nebraska.

#### MANSLAUGHTER

The elements of the crime of Manslaughter are:

1. That [German], either independently or while aiding and abetting another, killed . . . Swanson; and

2. That [German], either independently or while aiding and abetting another, did so

a. Intentionally without malice upon a sudden quarrel; or

b. Unintentionally while in the commission of an unlawful act, to wit, an unlawful restraint upon the liberty of . . . Swanson.

3. That [German] did so on or about or around the dates of November 12, 2019 to November 21, 2019, in Chase County, Nebraska.

A death occurs while in the commission of an unlawful act if death came in a natural and continuous sequence from [German's] unlawful act and if without that act the death would not have occurred.

. . . .

EFFECT OF FINDINGS

You must separately consider in the following order the crimes of (1) Murder in the First Degree, (2) Murder in the Second Degree, and (3) Manslaughter.

For the crime of Murder in the First Degree, you must decide whether the State proved each element beyond a reasonable doubt. If the State did so prove each element, then you must find [German] guilty of Murder in the First Degree and stop.

If, however, you find that the State did not so prove, then you must proceed to consider the next crime in the list, Murder in the Second Degree. You must proceed in this fashion to consider each of the crimes in sequence until you find [German] guilty of one of the crimes or find him not guilty of all of them.

The corresponding aiding instruction stated:

[German] can be guilty of the crime of Murder in the First Degree, Murder in the Second Degree or Manslaughter, even though he personally did not commit every act involved in the crime so long as he aided someone else to commit it. [German] aided someone else if:

1. [German] intentionally encouraged or intentionally helped another person to commit the crime; and

2. [German] intended that the crime be committed; or [German] knew that the other person intended to commit the crime; and

3. The crime in fact was committed by that other person.

Mere encouragement or assistance is sufficient. On the other hand, evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving [German] guilty.

#### b. Kidnapping

The State also charged German with kidnapping Swanson. The court instructed the jury that the elements of kidnapping were:

1. That [German], either independently or while aiding and abetting another, did abduct . . . Swanson, or having abducted her, continued to restrain her; and

2. That [German], either independently or while aiding and abetting another, did so with the intent to terrorize her or with the intent to commit a felony; and

3. That he did so on or about or around the dates of November 12, 2019 to November 21, 2019 in Chase County, Nebraska.

That for purposes of the charge of Kidnapping the crimes of Murder in the First Degree, Murder in the Second Degree, Manslaughter and First Degree False Imprisonment, are felonies under Nebraska law.

With regard to aiding and abetting, the court's instruction was the same as that given for aiding a homicide with the exception of the crimes. In place of homicides, it substituted the crimes of "Kidnapping, First Degree False Imprisonment, or Second Degree False Imprisonment."

#### (ii) Instructions Requested

German proposed two jury instructions on aiding a crime, which the court refused. They were substantially similar to the aiding instructions given by the court.

In both of German's requested instructions, he proposed adding the following paragraph derived from *State v. Ramsay*[16]:

---

[16] *State v. Ramsay*, 257 Neb. 430, 598 N.W.2d 51 (1999).

> When the elements of a crime charged require proof of
> the existence of a particular intent, an alleged aider or
> abettor can be held criminally liable as a principal only if
> it is shown that the aider and abettor knew that the perpe-
> trator of the act possessed the required intent, or that the
> aider and abettor himself possessed such intent.

However, for aiding a homicide, German's proposed instruc-
tion inserted "Intentional" before "Manslaughter."

### (c) Discussion

#### (i) Ramsay *Language*

There is no dispute that the *Ramsay* language proposed by
German was a correct statement of the law. But the question
becomes whether German was prejudiced by the use of other
language where the court based its aiding instruction on NJI2d
Crim. 3.8. Two principles dictate that he was not.

[13] First, when there is an applicable instruction in the
Nebraska Jury Instructions, the court should usually give that
instruction to the jury in a criminal case.[17] That is precisely
what the court did.

[14] Second, parties have no right to particular language
in a jury instruction; they are entitled to nothing more or less
than a fair, impartial, and complete statement of the appli-
cable law.[18] We discern no significant difference between
the instructions given and German's requested instructions.
Because there is no prejudice, there is no reversible error in
the court's refusal to give German's proposed instructions con-
taining the *Ramsay* language.

#### (ii) Intentional Manslaughter

German next contends that the instructions for homicide
and kidnapping were problematic because they incorporated
an unintentional form of manslaughter as a possible predicate

---

[17] *State v. Esch*, 315 Neb. 482, 997 N.W.2d 569 (2023).

[18] See *Gustafson v. Burlington Northern RR. Co.*, 252 Neb. 226, 561 N.W.2d
212 (1997).

felony. German asserts that "aiding and abetting must be affixed to intentional crimes."[19] Thus, as noted, his proposed instruction limited manslaughter to "Intentional Manslaughter." Under the circumstances here, we need not determine whether this aspect of the instructions was correct.

Even if the instructions were erroneous, German cannot establish prejudice. His arguments are based on instructing the jury as to a form of manslaughter that is an unintentional crime. But here, the jury convicted German of second degree murder. Accordingly, under the effect of findings portion of the homicide instruction, the jury "stop[ped]" before ever considering the crime of manslaughter. Nor was there any basis to find that German was convicted of kidnapping based on an unintentional form of manslaughter. German had the burden to show that the instructions were prejudicial, and he has failed to meet that burden. We find no reversible error.

### 3. Kidnapping Sentence

German challenges his sentence to life imprisonment for kidnapping. He contends that under the U.S. Supreme Court's *Alleyne* decision, the jury was required to make findings as to certain matters that differentiated a mandatory life sentence from a sentence for a Class II felony.[20]

### (a) Standard of Review

[15] The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.[21]

### (b) Additional Facts

Prior to sentencing, German submitted a brief to the district court in which he asserted that facts controlling mandatory minimum sentences must be decided by a jury under

---

[19] Brief for appellant at 30.

[20] See *Alleyne v. United States, supra* note 1.

[21] *State v. Said*, 306 Neb. 314, 945 N.W.2d 152 (2020).

*Alleyne*. During the sentencing hearing, the court disagreed that the jury had to make the determination about whether the victim was liberated alive, reasoning that the jury implicitly did so by finding German guilty of second degree murder. To the extent the court needed to make a finding, it found beyond a reasonable doubt that Swanson was kidnapped, was not voluntarily released or liberated alive by the abductor, and was not left in a safe place without having some serious bodily injury.

(c) Discussion

We start our discussion with *Apprendi v. New Jersey*.[22] In that case, the U.S. Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[23] A couple of years later, in *State v. Becerra*,[24] we considered *Apprendi* in connection with Nebraska's kidnapping statute.

The kidnapping statute, Neb. Rev. Stat. § 28-313 (Reissue 2016), provides for a lesser penalty depending on treatment of the victim. The statute provides:

(1) A person commits kidnapping if he abducts another or, having abducted another, continues to restrain him with intent to do the following:

(a) Hold him for ransom or reward; or

(b) Use him as a shield or hostage; or

(c) Terrorize him or a third person; or

(d) Commit a felony; or

(e) Interfere with the performance of any government or political function.

(2) Except as provided in subsection (3) of this section, kidnapping is a Class IA felony.

---

[22] *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

[23] *Id.*, 530 U.S. at 490.

[24] See *State v. Becerra*, 263 Neb. 753, 642 N.W.2d 143 (2002).

(3) If the person kidnapped was voluntarily released or liberated alive by the abductor and in a safe place without having suffered serious bodily injury, prior to trial, kidnapping is a Class II felony.[25]

In *Becerra*, we rejected an argument that whether a defendant's kidnapping sentence should be a Class IA felony or a Class II felony was a question for the jury to decide under *Apprendi*.[26] We stated that the factors to determine which penalty to impose were not elements of the offense of kidnapping, but, rather, were mitigating factors that may reduce a sentence under § 28-313. We explained:

Under § 28-313, any factual finding about whether the person kidnapped was voluntarily released affects whether the defendant will receive a lesser penalty instead of an increased penalty. *Apprendi* made clear that it was concerned only with cases involving an increase in penalty beyond the statutory maximum and does not apply to the mitigating factors in § 28-313.[27]

German argues that the premise from *Becerra* does not survive the U.S. Supreme Court's subsequent *Alleyne* decision. There, the Court stated: "[T]he essential Sixth Amendment inquiry is whether a fact is an element of the crime. When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury."[28]

Under the circumstances here, we need not determine whether *Alleyne* would require a jury to make factual findings under § 28-313(3). The jury found German guilty beyond a reasonable doubt of murdering Swanson. By making such a determination, the jury necessarily rejected the idea that Swanson was "voluntarily released or liberated alive by the

[25] § 28-313.

[26] See *State v. Becerra, supra* note 24.

[27] *Id*. at 759, 642 N.W.2d at 148.

[28] *Alleyne v. United States, supra* note 1, 570 U.S. at 114-15.

abductor and in a safe place without having suffered serious bodily injury, prior to trial."[29] We need not speak to the impact of *Alleyne* on a situation in which the evidence could support a safe release.

### 4. INEFFECTIVE ASSISTANCE OF COUNSEL

[16] German assigns several instances in which he claims that his trial counsel performed deficiently. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.[30] After setting forth the standard of review, we address each instance of alleged ineffective assistance.

### (a) Standard of Review

[17] Whether a claim of ineffective assistance of counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.[31]

[18,19] An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.[32] When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however,

---

[29] § 28-313(3).

[30] *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018).

[31] *State v. Npimnee, supra* note 11.

[32] *State v. Miller*, 315 Neb. 951, 2 N.W.3d 345 (2024).

an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.[33]

[20] Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[34]

### (b) Specific Assignments

#### (i) German's Statement to Police

With respect to German's custodial statement to law enforcement officers, German contends that his counsel provided ineffective assistance in numerous ways. First, he argues that counsel should have moved to suppress his statement, objected to the statement at trial and moved to strike it, or moved for a mistrial. Second, he asserts that counsel should have sought redaction of irrelevant and unduly prejudicial comments within that custodial statement. Third, he asserts that counsel should have mitigated the damage of his custodial statement.

### a. Additional Facts

Tessa Jakobsson, a detective with the Fort Collins Police Department, conducted a custodial interview of German. Jakobsson read German his *Miranda* rights, and he stated that he was willing to answer some questions. The jury heard the entirety of the interview.

German described his family as "big farmers" in Imperial, where "everybody knows everybody." He stated that he was "the only black kid in a town of 2,000 people" and that he learned what racism was "real quick." German stated that

---

[33] *Id.*

[34] *Id.*

he disliked Imperial because "the stigma there is just so dumb." He explained that his family was a "good family" and that he found it annoying everyone knows who you are and "expects you to like hand out money or something 'cause you're from the rich end of town." He claimed that Child Protective Services and police officers did not do their jobs because "people know people" and that the police and sheriff were corrupt.

German reported dropping Swanson off at Mann's house and then leaving with Carter. Jakobsson stated, "The problem is that you guys went somewhere and then you came back, and [Swanson] didn't come back with you." Jakobsson expressed her concern that Swanson was "dead out in a cornfield somewhere" and her desire to find Swanson's body. German responded, "I did nothing." He added, "I've said my piece." He then complained about the circumstances in which he was taken into custody.

Jakobsson told German that his story was "complete garbage." German replied, "It was complete garbage, ma'am? [indiscernible] why don't you just get me a lawyer then?" Jakobsson stated: "I don't need to get you a lawyer unless you want a lawyer. Would you like a lawyer? I can certainly get you one; I'm just hoping that you will give me the truth, show me where [Swanson] is . . . ." German and Jakobsson continued talking, and German repeatedly denied knowledge of Swanson's whereabouts. German stated, "And you know what, I would gladly talk to Nebraska cops that are from Chase County, and I would gladly talk to the family." Jakobsson retorted, "Perfect, I will go get you a Chase County deputy." German replied: "Sweet. Thank you."

Chase County Deputy Sheriff Duncan Einspahr then entered the room. Einspahr told German what he learned from interviews with others and stated, "The jig is up." German replied, "With what?" Einspahr said: "With [Swanson]. I know what happened. . . . Really, man? You're gonna sit there, to my face, and tell me that you don't know what happened and

where she is? You're not gonna help me find her?" German discussed putting Swanson in Carter's car, driving her out of town, and dropping her off. He claimed to have removed Swanson from a bad situation. German hypothesized that Swanson "either ran off with a Mexican dude . . . or she got killed." Einspahr then explained why he thought German killed Swanson.

### b. Discussion

#### i. Failing to Move to Suppress, Object at Trial, Move to Strike, or Move for Mistrial

[21-24] Whether or not a suspect initially waived his or her right to remain silent, the suspect retains the right to cut off questioning.[35] But a suspect must articulate the desire to cut off questioning with sufficient clarity that a reasonable police officer under the circumstances would understand the statement as an invocation of the right to remain silent.[36] Ambiguous or equivocal statements that might be construed as invoking the right to silence do not require the police to discontinue their questioning.[37] In determining whether there has been a clear invocation of the right to remain silent, an appellate court reviews the totality of the circumstances surrounding the statement in order to assess the words in context.[38]

German argues that he clearly and unequivocally invoked his right to remain silent. He relies on his statements of "I've said my piece" and "I'm done." But "[w]e have never held that any utterance of 'I'm done,' no matter what the surrounding circumstances or other statements, will be construed as cutting off all further questioning."[39] From the

---

[35] *State v. Schroeder*, 279 Neb. 199, 777 N.W.2d 793 (2010).

[36] *Id.*

[37] *Id.*

[38] See *id.*

[39] *Id.* at 218, 777 N.W.2d at 809.

context surrounding German's statements, it appears that he was merely conveying that he had told the officer all that he knew. Because German did not unequivocally invoke the right to remain silent, counsel had no basis to move to suppress the statement, object to it, move to strike it, or move for a mistrial. We conclude that counsel's performance was not deficient.

### ii. Failing to Seek Redaction of Irrelevant and Unduly Prejudicial Statements

German contends that counsel should have objected or sought to redact numerous statements by German. Those statements included his negative comments about Imperial and its residents, his statements that he suffered from racism, and his comments about law enforcement's being corrupt. While German's comments may have been only minimally relevant, he does not explain how they were unfairly prejudicial. But on direct appeal, he is not required to make a showing of prejudice regarding ineffective assistance of counsel. Because the record does not disclose trial counsel's reasons for not objecting or seeking redaction, we conclude that the record is insufficient to address this assignment.

### iii. Failing to Mitigate Damage of Statement

German asserts as deficient performance the failure of counsel to address the prejudice of German's custodial statement. Specifically, German contends that counsel failed to argue that German was compelled to protect Carter due to his belief that Carter was pregnant with his children.

But this claim is refuted by the record. During cross-examination of Jakobsson, defense counsel asked her about situations "in which one witness that you're interviewing or somebody in a custodial interrogation may not be fully truthful to law enforcement to start with because they're trying to protect somebody else." Jakobsson testified she considered that German might try to protect the mother of his children.

Then, in closing arguments, counsel reminded the jury of Jakobsson's testimony that people commonly lie to police to protect others and argued that German thought "he was protecting the woman who was carrying the three triplet children gestating in . . . Carter, protecting her because of her misconduct and what would happen if she was convicted [and] put into the criminal justice system."

German also asserts that counsel failed to argue that the State maintained the burden of proof beyond a reasonable doubt and that the jury could not merely weigh German's version of events against the State's case. The record refutes the former assertion, and the latter assertion is not entirely accurate.

The record shows that defense counsel began his closing argument by talking about safeguards and the proper way to arrive at a verdict. Counsel stressed that the government had to provide proof and that the proof had to be beyond a reasonable doubt. Counsel presented the jury with a chart that "kind of shows you, in words, what we're talking about when we talk about beyond a reasonable doubt." Counsel reminded the jury that "you could have a firm belief in the existence of the fact to be proven, and yet that's not guilt beyond a reasonable doubt." While the jury was entitled to weigh German's version against the State's case, the State was required to prove every element of an offense beyond a reasonable doubt[40] and not merely by the greater weight of the evidence. Because the record shows that counsel emphasized the State's burden of proof, we conclude counsel did not perform deficiently.

### (ii) Jury Instructions

German claims that defense counsel provided ineffective assistance with respect to jury instructions in two ways. One assertion is that counsel should have requested a curative instruction on implicit and unconscious bias. The other is that

---

[40] See *State v. Mann, supra* note 13.

counsel should have either objected to the jury instruction on kidnapping that German claims to be incorrect or offered a correct instruction.

### a. Additional Facts

German and Carter are African American. During pretrial status hearings, defense counsel and the court discussed racial bias. In a hearing on a motion for change of venue, defense counsel noted that "we have a very small population in . . . Chase County that is 93 percent white, has less than one percent African American or minority percentage."

During jury selection, there was an emphasis on the ability to be fair and impartial and a discussion of race. Defense counsel stated, "I think there are people who consciously, and other people subconsciously, who still have some mental impairment in the sense of — about dealing with African American citizens in our country." Counsel inquired whether anyone thought that "African Americans are more likely to commit crimes than white people." He stated, "Now, if there's any of you that feel that way, I just need to know . . . ." No one responded.

### b. Discussion

#### i. Failing to Request Instruction
#### on Implicit Bias

Citing case law from Iowa[41] and proposed jury instructions formulated by a Washington committee,[42] German argues that counsel should have offered a jury instruction on implicit bias. But two principles dictate otherwise.

First, the standard instructions given were sufficient to cover the concept. A preliminary instruction provided in part:

---

[41] *State v. Plain*, 898 N.W.2d 801 (Iowa 2017).

[42] Western District of Washington, Criminal Jury Instructions, https://www.wawd.uscourts.gov/sites/wawd/files/CriminalJuryInstructions-ImplicitBias.pdf (last visited June 7, 2024).

"Do not allow sympathy or prejudice to influence you. Do not indulge in any speculation, guess, or conjecture. And do not make any inferences that are not supported by the evidence." Similarly, the final instructions included the following: "The law demands of you a just verdict. You must not indulge in any speculation, guess, or conjecture. You must not allow sympathy or prejudice to influence your verdict." As set forth previously, if the jury instructions, read together and taken as a whole, adequately cover the issues, there is no prejudicial error.[43]

[25] Second, we have stated that counsel's failure to raise novel legal theories or arguments or to make novel constitutional challenges in order to bring a change in existing law does not constitute deficient performance.[44] The same is true with respect to failing to offer a pioneering jury instruction. We conclude that counsel's failure to request a novel jury instruction does not constitute deficient performance. Accordingly, counsel did not perform deficiently in this regard.

### ii. Kidnapping

German's assertion that counsel provided ineffective assistance by failing to object to the kidnapping jury instruction or to tender an appropriate instruction fails. As discussed above, the jury found German guilty of second degree murder. Thus, the arguments related to unintentional manslaughter and depriving the jury of the opportunity to consider the safe release provision of § 28-313(3) lack merit. Even if counsel performed deficiently, German cannot show that he suffered prejudice.

### (iii) Evidence of Possibility of Polygraph Testing

German faults his counsel for offering evidence that Mann and Carter were subject to the possibility of polygraph testing.

---

[43] See *State v. Npimnee, supra* note 11.

[44] *State v. Kipple*, 310 Neb. 654, 968 N.W.2d 613 (2022).

### a. Additional Facts

Upon defense counsel's offers, the court received unredacted proffer agreements of Mann and Carter. Each agreement included a provision stating, "Further cooperation to include, but not limited to, further interviews, permissions to search, and/or polygraph examination(s) by a government polygraphist, may be required . . . ."

### b. Discussion

German contends that allowing the unredacted documents "opened the possibility that law enforcement and the government have given polygraph examinations to the witnesses"[45] and that the jury may surmise that Mann and Carter would not have been called to testify if they had failed the examination. But counsel offered the agreements to impeach the credibility of Mann and Carter.

Although counsel could have redacted the provision concerning the possibility of polygraph testing, German cannot show that he suffered prejudice from the failure to do so. The agreements mentioned polygraph examinations as an option— not a requirement—and there was no evidence that Mann or Carter actually submitted to such an examination. Further, the State adduced other evidence that corroborated the testimonies of Mann and Carter. Thus, even if counsel performed deficiently, German cannot establish prejudice.

### (iv) Cross-Examination of DNA Analyst

German alleges that counsel performed ineffectively by cross-examining the DNA analyst, Porter, with respect to the testing procedure on the clear plastic bottle.

### a. Additional Facts

The direct examination of Porter established that she swabbed around only the rim of the bottle for a DNA profile. The DNA profile on the swab included Carter and Swanson

---

[45] Brief for appellant at 62.

as contributors to the sample but excluded German as a contributor.

On cross-examination, defense counsel asked questions highlighting that Porter swabbed the entire bottle of vegetable oil but swabbed only the rim of the clear plastic bottle. Counsel asked if "there is a possibility that on the . . . container there was a DNA profile that could have been developed had you swabbed it all around the bottom, below the one-half inch line where you did the swabbing to determine whether or not it was there?" And Porter answered, "Yes, I could have swabbed it to try and develop a DNA profile, that is correct."

### b. Discussion

German asserts that his counsel's line of questioning caused him prejudice because "[t]here is a strong possibility that the jury speculated that [German's] DNA could still have been on that bottle in the area which was not swabbed by the analyst."[46] But it is apparent that counsel sought to attack the thoroughness of the State's investigation, which is a reasonable defense tactic. Further, German cannot show prejudice because Porter had already testified on direct examination that it would be improper to conclude that a person did not handle an item just because that person's DNA was not found on it. This claim of ineffective assistance fails.

### (v) Advice Regarding Waiver of
### Right to Testify

Finally, German asserts that his counsel provided unreasonable advice that prevented German from meaningfully exercising his right to testify.

### a. Additional Facts

The court reporter documented a discussion between defense counsel and German regarding German's right to

---

[46] *Id.* at 63.

testify. According to the questions asked and answers given, counsel and German discussed on numerous occasions whether it would be beneficial for German to testify. German stated that he understood he had a constitutional right to testify in his own behalf and that it was his choice whether he would testify. German stated that he concluded he did not want to testify, that he was not pressured by counsel or any employee of counsel's law firm, and that he made the decision on his own. When asked if German felt it was the appropriate choice for him under the circumstances, he answered, "Yes, sir."

### b. Discussion

German's assignment of error stated merely that counsel was ineffective "in respect to [a]dvice [p]rovided on the [d]ecision to [w]aive the [r]ight to [t]estify [b]y [p]roviding [u]nreasonable [a]dvi[c]e [n]ecessary for a [m]eaningful [d]ecision." This assignment lacks the specificity we demand on direct appeal.

[26] Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity.[47] This is not a new principle.[48] We have adhered to it on numerous occasions.[49]

---

[47] *State v. Turner*, 315 Neb. 661, 998 N.W.2d 783 (2024).

[48] See *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

[49] See, *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023); *State v. Applehans*, 314 Neb. 653, 992 N.W.2d 464 (2023); *State v. Fernandez*, 313 Neb. 745, 986 N.W.2d 53 (2023); *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023); *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022); *State v. Drake*, 311 Neb. 219, 971 N.W.2d 759 (2022); *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022); *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021); *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021); *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020); *State v. Archie*, 305 Neb. 835, 943 N.W.2d 252 (2020); *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020).

As alluded to earlier, the necessary specificity of allegations of ineffective assistance of trial counsel on direct appeal for purposes of avoiding waiver requires, at a minimum, allegations of deficient performance described with enough particularity for an appellate court to make a determination of whether the claim can be decided upon the trial record and also for a district court later reviewing a potential petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.[50] Because German's assignment is not sufficiently specific, we decline to address it.

We observe that German expanded on counsel's specific deficiencies in the argument portion of his brief. There, he set forth:

> [German] specifically alleges trial counsel failed to properly explain the relative advantages or disadvantages of testifying; did not sufficiently advise [German] of what questions [he] would be subject to on cross-examination if [German] did testify; did not explain the questions that would be asked of [German] and the relative risks of those inquiries if [German] exercised the right to testify.[51]

But even this expanded assertion does not set forth the advice actually given and claimed to be insufficient, or the specific advice not given. Thus, it lacks the necessary specificity.

## VI. CONCLUSION

Finding no abuse of discretion in the receipt of photographic evidence and no reversible error related to the jury instructions or kidnapping sentence, we affirm the judgment of the district court. With regard to German's ineffective assistance of counsel claims, they either lack merit, cannot be resolved on the existing record, or were not sufficiently alleged.

Affirmed.

---

[50] See, *State v. Miller, supra* note 32; *State v. Blake, supra* note 49.

[51] Brief for appellant at 64.